| | |
|---|---|
| MIKE BENDFELDT and<br>BETTY MUHR-BENDFELDT,<br><br>     Plaintiffs,<br><br>-vs-<br><br>WINDOW WORLD, INC., a North<br>Carolina corporation,<br><br>and<br><br>ASSOCIATED MATERIALS, LLC, a<br>Delaware limited liability company,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>COMPLAINT</u>

1.      Plaintiffs Mike Bendfeldt and Betty Muhr-Bendfelt are citizens and residents of the State of Nebraska.  Plaintiffs were previously licensees/franchisees of Defendant Window World, Inc. with territories in Omaha, Nebraska; Des Moines, Iowa, Denver Colorado; Sioux Falls, South Dakota; Cedar Rapids, Iowa; Chicago, Illinois; Reno, Nevada; Davenport, Iowa; Mason City, Iowa; Portland, Oregon; Lincoln, Nebraska; Grand Island Nebraska; Seattle, Washington; Fargo, North Dakota; and Wichita, Kansas.  All license/franchise agreements were signed by Plaintiffs individually and by various entities which were wholly owned and operated by them; Those entities listed below and have assigned any interest they may have in these claims to Plaintiffs Mike Bendfeldt and Betty Muhr-Bendfelt:

Window World – Cedar Rapids, Inc., Window World – Grand Island, Inc., Window World – Mason City, Inc., Window World – North Dakota, Inc., Window World – Portland, Inc., Window World – Quad Cities, Inc., Window World – Seattle, Inc.,

Window World, Inc., Window World – Lincoln, Inc., Window World – Omaha, Inc., and

Window World- South Dakota, Inc.

2.      Defendant Window World, Inc., ("WW") is a corporation organized and existing

under the laws of the State of North Carolina with its principal place of business in the State of

North Carolina.

3.      Defendant Associated Materials, LLC ("AMI") is a limited liability company

organized and existing under the laws of the State of Delaware with its principal place of

business located in the State of Ohio;  at all times relevant herein, Defendant AMI operated

under the trade name of Associated Materials, Inc.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

4.      WW is in the business of selling licenses and franchises to individuals and entities

who transact business involving the sale and installation of vinyl replacement windows, doors

and siding to the general public under the name "Window World."

5.      WW was founded in 1995 by Leon Whitworth.

6.      WW operates through a network of licensees/franchisees located throughout the

United States.

7.      WW sold its first "license" in 1997 and began operations in 1998.  By 2010, the

number of WW "licensees" had grown to around 200 locations throughout the country.

8.      Potential WW licensees were led to believe that by executing a license agreement

with WW for a relatively low "license" fee, they would be part of the WW system, could utilize

the WW name, and would have access to the best pricing for windows and related materials due

to the volume buying power of the WW system.

9.      Since at least 2000, Defendant Associated Materials, LLC ("AMI") has served as a supplier of vinyl replacement windows to WW licensees/franchisees under AMI's "Alside" brand.

10.      The relationship between WW and AMI grew closer over time until 2007 when WW designated AMI as the exclusive supplier of windows to WW licensees/franchisees who were informed by WW that the licensees/franchisees were prohibited from using any alternate suppliers.

11.      Upon information and belief, at some point prior to 2007 Leon Whitworth and his son Todd Whitworth acquired stock ownership interest in AMI.

12.      In September of 2007, Todd Whitworth acquired WW from Leon Whitworth and Leon Whitworth's former wife, Marie Whitworth.  The acquisition was accomplished through a redemption of the WW shares of Leon Whitworth and Marie Whitworth.  WW purchased Leon Whitworth's shares for $33 million, payable in $3 million in cash and a promissory note calling for installment payments for the remaining $30 million.  WW purchased Marie Whitworth's shares pursuant to an agreement to pay her $1 million per year for life.  Upon consummation of these transactions, Todd Whitworth assumed the position of Chief Executive Officer of WW.

13.      Upon information and belief, in order to obtain the cash needed to complete the aforementioned purchase of shares, Todd Whitworth secured a loan from AMI.

14.      At no time did WW disclose to Plaintiffs or other WW licensees/franchisees that WW owners held stock in AMI or that AMI had loaned money to WW owners.

## PLAINTIFFS ACQUIRED A NUMBER OF WINDOW WORLD LICENSES

15.      As set forth in the chart below, from 2001-2009 Plaintiffs entered into a series of "License Agreements" with WW.  Prior to and at the time those "License Agreements" were

executed, WW represented to Plaintiffs that as WW "licensees" they would receive the best possible pricing for windows base upon WW representations made to them.

| Date of Purchase | Location | Date Closed/Sold |
|---|---|---|
| October 16th, 2001 | Des Moines, IA | 2012 |
| October 16th, 2001 | Omaha, NE | 2013 |
| April 30th, 2004 | Denver, CO | 2004 |
| June 20th, 2005 | Sioux Falls, SD | 2013 |
| June 20th, 2005 (renewal) | Des Moines, IA | 2012 |
| June 20th,2005 | Cedar Rapids, IA | 2012 |
| February 8th, 2006 | South Cook County, IL | 2008 |
| February 8th, 2006 | North Cook County, IL | 2008 |
| August 8th, 2006 | Reno, NV | 2010 |
| February 19th, 2007 (renewal) | Omaha, NE | 2013 |
| August 27th, 2007 | Davenport, IA | 2011 |
| October 8th, 2007 | Portland, OR | 2011 |
| December 10th, 2007 | Mason City, IA | 2011 |
| April 15th, 2008 | Lincoln, NE | 2013 |
| April 15th, 2008 | Grand Island, NE | 2012 |
| September 30th, 2008 | Seattle, WA | 2011 |
| June 27th, 2008 | Fargo, ND | 2012 |
| October 19th, 2009 | Wichita, KS | 2013 |

16. In addition to the Licensing Agreements executed by Plaintiffs, Plaintiffs also agreed to provide services to the Bismarck, North Dakota WW trade area after the licensee abandoned the trade area.

17. In the fall of 2010, WW approached Plaintiffs to request that they assist WW by servicing the Bismarck, North Dakota trade area until a permanent licensee could be identified and placed into that area.

18. Plaintiffs agreed to provide such assistance with the understanding that they would be reimbursed for costs associated with providing such service.

19. In fact, Plaintiffs had to hire additional office personnel in order to provide such services.

20.     Plaintiffs provided such services until early 2013.

21.     Despite repeated assurances from WW, Plaintiffs have never received reimbursement for the costs associated with services to the Bismarck, North Dakota trade area.

## I.     WW Knowingly and Intentionally Failed to Make Required Franchise Disclosures to Plaintiffs and other Window World franchisees

22. In its agreements with individuals and/or entities who have licensed Window World trademarks from WW, WW has specifically structured its relationship in a manner clearly and commonly associated with franchise agreements.

23.     WW acknowledges and admits that its relationships with business dealers to whom it licenses Window World trademarks are, and always have been, business relationships in which a franchisor licenses the right to use trademarks to franchisees, thereby creating franchise agreements under federal law, which affords special protections to franchisees such as Plaintiffs.

24.     Moreover, throughout the period that WW was selling franchises to Plaintiffs, and others, WW knew that in fact it was selling franchises and knew that, as a result, it was obligated to meet certain statutory obligations, both state and federal, that apply to franchisors and to those in the business of selling franchises. WW's directors and upper management, including Leon Whitworth, Todd Whitworth, and Tammy Whitworth, at all times knew that WW's relationship with its dealers was that of franchisor-franchisee and that WW was therefore bound to make certain disclosures under federal and state law and to comply with other federal and state law that govern franchisors.

25.     Among these is the requirement under federal law that franchisors make a battery of disclosures to persons considering whether to enter into a franchise agreement,

Case 5:17-cv-00039-GCM   Document 1   Filed 10/16/15   Page 5 of 25

which is set out at 16 C.F.R. § 436.1, *et seq.* (the "Franchise Disclosure Rule"). These franchise disclosure rules apply to franchisors, such as WW, and exist to provide transparency that protects franchisees, such as Plaintiffs, who otherwise suffer from inferior bargaining power vis-a-vis trademark owners who seek to induce others to enter into franchise relationships.

26.     The Franchise Disclosure Rule specifically provides that a franchisor's failure to comply with the rule constitutes an unfair or deceptive trade practice.

27.     WW has always met the definition of a "franchisee seller" and a "franchisor" under the Franchise Disclosure Rule, and its relationship with the Window World franchisees, including Plaintiffs, has always met the rule's definition of a "franchise." WW and its upper management were at all times aware of these facts and that WW had disclosure obligations under federal law.

28.     The disclosures required under the Franchise Disclosure Rule include a range of financial information about the franchisor and existing franchisees, as well as information on over twenty discrete topics, which include the following:

a.     The initial fees and any conditions under which these fees are refundable, as well as the formula used to calculate initial fees that are not uniform and the factors that determine the amount of the fees. *See* 16 C.F.R. § 436.5(e).

b.     All other fees that the franchisee must pay to the franchisor.     *See* 16 C.F.R. § 436.5(f).

c.     The franchisee's estimated initial investment. *See* 16 C.F.R. § 436.5(g).

d.     Important provisions of the franchise, including length of the term, renewal of the term, choice-of-forum clauses, and choice-of-law clauses.     *See* 16 C.F.R. § 436.5(q)

e.      Substantial information about the trademarks licensed to the franchisee. *See* 16 C.F.R. § 436.5(m).

f.      The franchisee's obligation, if any, to purchase goods from a particular vendor or supplier in operating the franchised business. *See* 16 C.F.R. § 436.5(h).

g.      For mandated suppliers, identification of any supplier in which an officer of the franchisor owns an interest, and of any supplier from whom the franchisor will or may derive revenue or other material consideration by virtue of franchisees being required to make purchases from that supplier. *See* 16 C.F.R. § 436.5(h)(3), (6), (8).

29.     The Franchise Disclosure Rule also requires that before any franchisor unilaterally and materially alters the terms of the basic franchise agreement, it must furnish a copy of the revised agreement at least seven days before execution of the document.

30.     A number of states also have their own disclosure requirements applicable to franchisors and require franchisors to register their franchise offerings with certain state agencies before offering the franchises for sale.

31.     Despite its knowledge of the obligations WW owed as a franchisor to its franchisees and prospective franchisees, WW knowingly, intentionally, and in bad faith failed to make the disclosures required under the federal Franchise Disclosure Rule, both in conjunction with offering new franchise agreements to prospective franchisees, including Plaintiffs, and in conjunction with offering to renew franchise agreements with current and former franchisees, including Plaintiffs.

32.     At no point prior to Plaintiffs' execution of any of the "Licensing Agreements" did WW made any effort to comply with these obligations in marketing Window World franchises to potential franchisees, including Plaintiffs, and in structuring

its relationships with franchisees, including Plaintiffs. In particular, WW knowingly and intentionally sold Window World franchises to Plaintiffs and others, and submitted new and materially different franchise agreements to Plaintiffs and other existing Window World franchisees for execution, without making the disclosures required by the Federal Disclosure Rule. For example, WW's upper management, including Todd Whitworth, participated in internal meetings in which it was acknowledged that WW's relationship with its dealers was that of franchisor-franchisee, not licensor-licensee.

33.     As a result of this misconduct, a number of States have entered orders enjoining WW from selling unregistered franchises. By way of example and without limitation, WW has entered into consent orders in California, Illinois, Washington, Minnesota, Maryland, and Virginia, which in some cases impose civil penalties against WW in addition to requiring WW to offer rescission as part of the injunctive relief prescribed.

34.     With respect to each sale of a Window World franchise to Plaintiffs between 2001 and 2009, WW knowingly, intentionally, and in bad faith failed to comply with the Franchise Disclosure Rule, in form and in substance.

35.     WW failed to meet its disclosure obligations so as to keep hidden from its franchisees and potential franchisees, including Plaintiffs, a range of information about the true nature of the financial arrangement between WW and its franchisees, the true nature of the arrangements between WW and the suppliers required to be used by the franchisees, the true nature, scope, and extent of the revenues WW collects as franchisor from its franchisees, and the true nature of the trademarks licensed to WW's franchises.

36.     WW initially provided lists of approved suppliers to its franchisees, and that included more than one supplier for windows. For example, on January 22, 2007, Todd

Case 5:17-cv-00039-GCM   Document 1   Filed 10/16/15   Page 8 of 25

Whitworth wrote to all Window World franchisees, informing them that along with caulking, printing, and promotional materials, "other products such as windows, siding and related materials, doors, gutter, gutter protections, and financing must be purchased from the approved vendor. While enforcement of this as it relates to many products has been ignored in the past it will not be in the future." The list provided with Whitworth's included AMI and "Xact/MI" as approved suppliers of windows and patio doors.

37. Later in 2007, WW announced that it was moving to a "sole source" supplier of windows and thereafter required that its franchisees purchase vinyl replacement windows only from AMI. A f t e r  t h a t  t i m e , P laintiffs made their wholesale window purchases exclusively from AMI.

38. Although unknown to Plaintiffs until recently, WW receives a substantial portion of the purchase price its franchisees pay to WW-designated suppliers, including AMI, for products and certain options on those products. AMI and WW's other designated suppliers provide these sums in the form of a kickback or rebate. For example, WW received approximately $24 million annually in revenue from WW-designated suppliers in 2011-2013 in the form of kickbacks or rebates. These amounts result from per-unit rebates provided by the designated supplier with respect to windows, patio doors, siding, and other products, as well as certain options to windows and patio doors, including "LowE," screens, interior laminates, grids, and colors. These undisclosed rebates can total, in the aggregate, more than $30 per window and thus in some cases may exceed the Window World franchisee's margin on the sale of the window at retail. Over the relevant time period, these kickbacks and rebates supplied nearly all the revenue that WW has collected in the course of its franchising business and totals tens of millions of dollars.

Case 5:17-cv-00039-GCM   Document 1   Filed 10/16/15   Page 9 of 25

39.    In addition to providing a substantial financial benefit to WW, these undisclosed kickbacks and rebates have inflicted substantial financial harm upon its franchisees by artificially inflating the wholesale price they pay for the products they sell and install.  Upon information and belief, the kickbacks and rebates WW receives represent all or a portion of the volume discount Plaintiffs and other Window World franchisees would otherwise receive from WW-designated suppliers, including AMI, as a rebate.   Thus, in substance and effect it is Plaintiffs and other Window World franchisees who pay as undisclosed commissions the amounts that WW receives from its designated suppliers in the form of these kickbacks and rebates.

40.    Despite the fact that information concerning any financial benefits a franchisor receives as a result of purchases made by its franchisees is a required disclosure item under the Franchise Disclosure Rule, WW failed to disclose these kickback and rebates to Plaintiffs and other Window World franchisees.  In fact, upon information and belief, WW's directors and upper management expressly decided not only that WW would not make these required disclosures but also that WW would hide from its franchisees the undisclosed commissions they pay and the undisclosed kickbacks and rebates WW receives from the suppliers.  By way of example and without limitation, WW made no disclosure of and instead hid from its franchisees the amount of the rebates, the manner in which the rebates were calculated, the products on which rebates were collected, the portions of the purchase prices paid by its franchisees that constitute the rebates, the negotiations underlying the rebates, and the impact of the rebates on the cost of goods sold by its franchisees.

41.    WW failed to make its required disclosures (including disclosure of these kickbacks and rebates it was receiving on purchases from AMI and other WW-designated suppliers).

42.     **In** addition to failing to disclosure the nature and extent of the kickbacks or rebates paid by WW's designated suppliers to WW on purchases made from those suppliers by Plaintiffs and other Window World franchisees, WW also failed to disclose other payments made by WW's designated suppliers to WW, including marketing fund payments and contributions to the Window World family reunion and other Window World events and meetings.

43.     **In** addition to the foregoing misrepresentations and omissions of material information with respect to the financial aspects of WW's relationship with its franchisees, WW also failed to disclose the stock interests that its principals held in AMI and the loan AMI made.

44.     WW, in bad faith, took affirmative steps to hide from Window World franchisees and potential Window World franchisees, including the Plaintiffs, that WW owed them obligations under federal law as a franchisor. For example, even though WW knew that it was selling franchises to Plaintiffs and other persons, WW cast the franchise agreements it presented to potential franchisees, including the Plaintiffs, as "Licensing Agreements" and purported to disclaim its status as a franchisor in those agreements.

45.     Those agreements, which were prepared by WW and not subject to negotiation, indicated that the business relationship between WW and its franchisee was merely that of a licensor of Window World trademarks and its licensee and that "[n]othing in this Licensing Agreement shall be deemed to create any type of partnership, employment, agency, franchise, or other business relationship other than LICENSOR and LICENSEE." The agreement went on to disclaim any obligation for WW to comply with "statutes, codes, or law and regulations which govern franchises."

46.     WW knew that these assertions in its agreements were false and that it indeed was engaged in the business of selling franchises and was obligated to comply with "laws and regulations" governing the franchise relationship, including the Franchise Disclosure Rule.

47.     However, it was not until after Plaintiffs executed the various "Licensing Agreements" described above that WW attempted to make _any_ disclosure to its franchisees and potential franchisees concerning the true nature of the financial arrangement between WW and its franchisees and the true nature, scope, and extent of the revenues WW collects as franchisor from its franchisees.  Instead, WW kept secret from Plaintiffs and other Window World franchisees material financial information about the franchise relationship, including the undisclosed amounts WW collected off of the purchases its franchisees made from WW-designated suppliers, including AMI until sometime after October 28th, 2011.

48.     WW has admitted to Window World franchisees, including Plaintiffs, that it was operating illegally before it began making any of the disclosures required by the Franchise Disclosure Rule.  By way of example and without limitation, Mark Bumgartner made such an admission at an Advisory Council meeting in August 2014.

49.     WW took the foregoing actions in bad faith so as to fraudulently induce its prospective franchisees, including Plaintiffs, to purchase Window World franchises and in order to fraudulently induce existing Window World franchisees to execute renewal "Licensing Agreements."

50.     WW's withholding of information that was required to be disclosed under federal law caused Plaintiffs to be ill-informed and fraudulently induced Plaintiffs to execute "Licensing Agreements" with WW.

51.     The foregoing failures by WW to meet its obligations as a seller of franchises, as well as its affirmative misrepresentations and material omissions, constitute unfair or deceptive

trade practices, fraudulent misrepresentations, fraudulent omissions, and negligent misrepresentations and have caused injury to Plaintiffs.

52.     WW withheld from Plaintiffs material information concerning the franchise relationship, intending that Plaintiffs would rely upon those material omissions by acquiring franchises from WW and continuing to operate those franchises. Plaintiffs reasonably relied to their detriment on WW's material omissions by paying substantial sums to acquire franchises, by paying inflated wholesale prices thereafter that resulted in funds flowing through to WW, and by expending millions of dollars advertising Window World trademarks, *all* of which benefitted WW substantially.

## II.     WW Failed to Meet Its Obligation to Secure Superior Wholesale Pricing for Plaintiffs and other Window World franchisees

53.     As a result, Plaintiffs reasonably formed the expectation that WW, as the franchisor of the Plaintiffs' franchisees, would secure pricing that was more favorable than what would otherwise be available in the market.

54.     The "Licensing Agreements" that Plaintiffs executed specifically provided that WW "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area herein defined." These agreements further provided that WW "shall use its best efforts to assist LICENSEE in any reasonable manner so as to maintain and, where appropriate, improve upon, the quality, efficiency, and profitability of the operation."

55.     As it turned out, WW has failed to meet its commitment to secure superior wholesale pricing for its franchisees, including the Plaintiffs' franchises. On the contrary, the amounts these franchisees pay and have paid to their vinyl replacement window supplier,

AMI, _exceed_ the amounts they would otherwise pay to AMI and to suppliers of comparable products in the relevant markets were they not Window World franchisees. Similarly, the amounts these franchisees pay and have paid to the suppliers of various related accessory products exceed the amounts they would otherwise pay to suppliers of comparable products in the relevant markets were they not Window World franchisees.

56. For example, representatives of AMI have admitted that it has sold windows to non-WW retailers at prices lower than those charged to Window World franchisees.

57. In addition, a former AMI representative has indicated that a window retailer in the Midwest purchases Alside's 4000 windows with LowE/argon for $120, which is cheaper per unit than the price AMI charges the Plaintiffs for the same product.

58. In addition, another Window World franchisee received in June 2012 an invoice from AMI that was intended for another AMI purchaser. The invoice, dated June 11, 2012 and addressed to a window retailer with multiple store locations in the Midwest, reflected a price for Alside's 0201 windows with ETC liners and Climatech-Plus that was $29.74 cheaper per unit than the price AMI charges Window World franchisees for the same product. This differential increases the cost of goods sold by the Plaintiffs' franchises by more than $1 million per year.

59. The above-market amounts the Window World franchisees have been required to pay to AMI for vinyl replacement windows result from an unlawful contract, combination, and/or conspiracy between WW and AMI.

60. In addition to above-market prices Window World franchisees have been required to pay — and continue to pay up to the present — for vinyl replacement windows,

they have also been required to pay above-market amounts to AMI and other suppliers for various other-products, including caulk, doors, siding, and garage doors.

61.     The above-market prices for these additional products further demonstrate that WW failed to meet its obligation to secure superior wholesale pricing for its franchisees.

### III.     WW Fraudulently Misrepresents the Pricing Levels Available to and Achieved by Plaintiffs

62.     Window World franchisees purchase the products they sell and install from suppliers designated by WW and at prices dictated by WW.

63.     WW consistently represented to Window World franchisees, including Plaintiffs, that WW had two tiers of dealer pricing for window purchases from AMI. The pricing levels were known as "A" pricing and "B" pricing, with "B" pricing being the more favorable pricing level. WW also consistently represented to Window World franchisees, including Plaintiffs franchises, that if a Window World franchisee hit certain performance benchmarks by reaching a defined volume of unit sales in a month it would be entitled to preferential pricing from AMI.

64.     For example, on February 7, 2008, Todd Whitworth of WW wrote to Window World franchisees and stated that "we have decided to change the sales levels for A and B pricing to more accurately reflect market sizes for our stores." Whitworth went on to state that WW was creating effective March 1, 2008 two different volume targets, based on market size, for achieving preferred pricing, stating that "it just isn't fair that Foothills (population 300,000) and Tidewater (population 1,350,000) should both have to sell 500 windows to achieve B pricing."

65.     Similarly, the Owner's Manual that WW distributed to its franchisees indicated that WW's "AMI Price List" contained "Prices for AMI products A & B Pricing." The manual

went on to state that WW's "AMI Multipliers" list contained "Multipliers to be used on AMI catalog products not covered by Window World A & B pricing."

66.     Similarly, on March 30, 2011, Dana Deem of WW wrote to various WW representatives and franchisees, stating "I have attached the new A & B Price sheets and multipliers that go into effect on orders placed April 4, 2011 and thereafter. Please print the applicable sheets and multipliers for your market and place in your SOP manual for future reference." Representatives from AMI were also copied on Deem's email message.

67.     WW made these representations and many other representations that were the same in substance to Window World franchisees on a uniform basis.

68.     Various representatives of WW, including Leon Whitworth, Todd Whitworth, Blair Ingle, and Dana Deem, consistently represented to Plaintiffs, and to Window World franchisees generally that "B" pricing was the most favorable pricing and would be available to a Window World franchisee if it achieved a certain volume of unit sales in a month.

69.     Representations of this sort were made uniformly to Window World franchisees on a monthly basis throughout the relevant time period.

70.     With these and other similar representations, WW deceived Window World franchisees, including Plaintiffs, telling them that they were entitled to receive, and in fact would receive and were receiving, the best available pricing on windows if they hit the specified performance benchmarks. In fact, these representations were false.

### IV.     WW Enters into an Unlawful Contract, Combination, or Conspiracy with AMI to Set Prices and in Restraint of Trade

71.     In 2007, WW through Todd Whitworth and other representatives entered into discussions with AMI about the wholesale prices charged to Window World franchisees and the kickback WW received on those sales. The product of those discussions was a

Case 5:17-cv-00039-GCM   Document 1   Filed 10/16/15   Page 16 of 25

combination, contract, and/or conspiracy among WW and AMI to increase the price Window World franchisees, including the Plaintiffs, would pay to AMI, to increase the undisclosed revenue that WW collected from each purchase its franchisees made from AMI, and to require that Window World franchisees purchase only from AMI.

72.     In particular, in exchange for WW committing to have its franchisees purchase products at wholesale only from AMI and at prices that were higher than they were currently paying, the kickback WW received off of those purchases would increase. This arrangement materially increased the volume of AMI's sales to WW's franchisees, which resulted in substantial increases in income for both AMI and WW.

73.     For example, in 2011, 2010, 2009, and 2008, AMI's sales to WW and its franchisees represented approximately 13%, 14%, 13%, and 11% of its total net sales, respectively. This represented a marked increase from AMI's customers in prior years, when no individual customer accounted for 10% or more of AMI's total net sales.

74.     After this agreement was reached, WW announced to its franchisees during the 2007 WW "family reunion" that it would be moving to AMI as the "sole source" supplier of windows within the WW network.

75.     While this arrangement enriched AMI and WW, it harmed competition and injured Window World franchisees.

76.     To begin with, this contract, combination, and/or conspiracy meant that the Window World franchisees, including Plaintiffs, were not receiving superior pricing in their markets.   Instead, they paid inflated prices resulting from an arrangement that secured capital and increased cash flow to WW while securing a larger customer base at a higher price for AMI.

77.     The Window World franchisees, including Plaintiffs, were also injured because the contract, combination, and/or conspiracy between WW and AMI reflected price maintenance that benefitted WW and AMI while hurting the Window World franchisees, who were AMI's customers.

78.     The arrangement between WW and AMI also meant that AMI was insulated from the forces of competition by preventing Window World franchisees from seeking other, and more economic, sources for the products they sold at retail.  The arrangement locked in place a substantial volume of purchasers at a fixed price, while preventing them from seeking alternative suppliers, which would work to drive prices lower in the marketplace.

79.     The Window World franchisees, including Plaintiffs, were also injured because the arrangement between WW and AMI resulted in an economic transfer from Window World franchisees to WW and AMI.  As alleged herein, the arrangement resulted in higher wholesale prices paid by the Window World franchisees.  That, combined with the fact that WW fixed the retail price at which its franchisees could sell their products, meant that the arrangement between WW and AMI eroded the margins of the Window World franchisees while enriching WW and AMI.

80.     WW benefitted from its arrangement with AMI through the increased kickbacks and rebates it received.   By withholding material information from the Window World franchisees and by misrepresenting to them the quality of the pricing they would have access to as Window World franchisees, WW induced Window World franchisees, including the Plaintiffs, to pay millions advertising the Window World trademarks.  This advertising increased goodwill in Window World trademarks and therefore increased the potential value of other Window World franchises that WW sold and exploited as sources of income.

81.     These hidden payments and the secret arrangements between WW and AMI should have been disclosed pursuant to the Franchise Disclosure Rule, but WW failed to do so with respect to the "Licensing Agreements" Plaintiffs executed. Instead, WW withheld this material information from Plaintiffs with the intent that they rely to their detriment on WW's material omissions.

## V. Fraudulent Concealment – Tolling of Statute of Limitations

76.     Throughout the relevant period set forth herein, Defendants affirmatively and fraudulently concealed their wrongful conduct from Plaintiffs and all other WW licensees/franchisees.

77.     Plaintiffs and all other WW licensees/franchisees did not discover and could not discover through the exercise of reasonable diligence that Defendants were violating the law as alleged herein until after Defendant WW admitted that it had been operating as a franchisor in violation of the laws of the United States and several states and finally disclosed the nature and extent of the rebates it was receiving from Defendant AMI. Such disclosure did not occur until sometime after October 28, 2011. Plaintiffs and all other WW licensees/franchisees could not have discovered the violations any earlier that that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. In addition, the conspiracy between the Defendants was by its nature self-concealing.

78.     As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs assert the tolling of any applicable statutes of limitation affecting the rights of action of Plaintiffs.

**COUNT I**

**(Violation of the Robinson-Patman Act, 15 U.S.C. §13)**

Come now Plaintiffs and for Count I of their cause of action against Defendants Window World, Inc. and Associated Materials, LLC and state as follows:

79. Plaintiffs re-allege and incorporate by reference as if fully set forth herein, paragraphs 1 - 78 of Plaintiffs' complaint.

80. The Robinson-Patman Act, 15 U.S.C. § 13 (the "Act") provides in relevant part as follows:

> It shall be unlawful for any person engaged in commerce…to discriminate in price between different purchasers of commodities of like grade and quality…where the effect of such discrimination may be to substantially lessen competition and tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly received the benefit of such discrimination, or with customers of either of them.

81. Defendant AMI is engaged in commerce throughout the United States in the sale of vinyl replacement windows.

82. The windows sold by Defendant AMI were "commodities" within the meaning of the Robinson-Patman Act.

83. Plaintiffs and all other WW "licensees" were purchasers of commodities as defined by the Act.

84. Defendant AMI discriminated in the price of vinyl replacement windows sold to WW "licensees" and charged higher prices to such purchasers than to WW competitors in the market for replacement windows of like grade and quality.

85. Defendant charged such higher prices in order to provide kickbacks and other undisclosed payments to WW and its owners.

86. The higher prices charged to Plaintiffs and other WW "licensees" injured competition among the customers of Defendant AMI who purchased replacement windows.

87. Defendant WW conspired with AMI to discriminate in the pricing offered to WW "licensees" and knowingly received the benefit of such discrimination in the form of kickbacks and payments it received from Defendant AMI which were not disclosed to WW "Licensees."

88. Plaintiffs and other WW "licensees" were injured by such conduct in that the injury to competition affected their profit margins due to the increased prices charged by Defendant AMI to Plaintiffs and other WW "licensees" for replacement windows.

89. The sole purpose of the increased prices was to enable to Defendant AMI to provide undisclosed kickbacks to Defendant WW.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendants for treble damages in excess of Seventy-Five Thousand Dollars ($75,000.00), an award of attorneys' fees, and for such other relief the court deems just and proper.

## Count II
## (Fraud)

Come now Plaintiffs and for Count II of their cause of action against Defendant Window World, Inc. state as follows:

90. Plaintiffs re-allege and incorporate by reference as if fully set forth herein, paragraphs 1- 78 of Plaintiffs' Complaint.

91. Plaintiffs executed a series of "Licensing Agreements" with Defendant Window World, Inc.

92. In those Licensing Agreements, Plaintiffs agreed "that it will sell and install **only and exclusively** those products, goods, equipment, and parts from vendors approved by LICENSOR."

93.     In exchange, Defendant Window World, Inc. represented to Plaintiffs that "LICENSOR shall endeavor to arrange for the supply of the items to LICENSEE at a prices which are less than those charged to non-licensees within the trade area herein defined."

94.     In addition, Defendant WW represented to Plaintiffs and other WW "licensees" that they were entering into "Licensing Agreements" while knowing that the relationship was actually a franchise relationship and that the laws of the United States and several states in which Defendant WW operated required certain disclosures which Defendant willfully chose to ignore.

95.     At the time that Defendant Window World, Inc., made the aforementioned written representations in each of the Licensing Agreements executed by Plaintiffs, it knew the representations were false at least regarding the replacement windows supplied by AMI in that Defendant Window World, Inc. knew that due to the rebates and kickbacks paid to Defendant Window World, Inc. by AMI that the prices charged to Window World licensees/franchisees for replacement windows actually exceeded the prices charged to non-licensees for the same window and it knew that it was operating as a franchisor but was not in compliance with regulations of the Federal Trade Commission and several state agencies.

96.     Plaintiffs were induced into entering the Licensing Agreement because they believed that as a licensee of Defendant Window World, Inc. they would receive beneficial pricing for replacement windows and that there were no other undisclosed fees.

97.     Plaintiffs justifiably relied upon the representations made by Defendant in the Licensing Agreements in making their decision to execute the Licensing Agreements.

98.     That as a direct and proximate result of the fraudulent misrepresentations made by Defendant Window World, Inc. to induce Plaintiffs to enter into the Licensing Agreements Plaintiffs sustained damage in that the prices they were required to pay to required suppliers as

mandated by Defendant were higher than what Plaintiffs would have paid had they not entered into Licensing Agreements with Defendant.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant Window World, Inc., for damages in excess of Seventy-Five Thousand Dollars ($75,000..00), an award of punitive damages, their costs herein expended, and for such other relief the court deems just and proper.

## Count III

### (Breach of Contract – Licensing Agreements)

Come now Plaintiffs and for Count III of their cause of action against Defendant Window World, Inc., state as follows:

99.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein Paragraphs 1 to 78 of Plaintiffs' Complaint.

100.     Pursuant to the Licensing Agreements executed by and between Plaintiffs and Defendant, Defendant agreed that it "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area…"

101.     Defendant breached the duty owed to Plaintiffs under the foregoing provisions of the Licensing Agreement in that Defendant did not "endeavor" to arrange for pricing of supplies such as replacement windows which were less than the prices charged to non-licensees in the trade areas operated by Plaintiffs.

102.     As a result of Defendant's breach of the Licensing Agreements as aforesaid, Plaintiffs were damaged in that the prices charged to them for supplies such as replacement windows were higher than were charged to Plaintiffs' competitors within the trade areas operated by Plaintiffs.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant Window World, Inc., in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), their costs herein expended, and for such other relief the Court deems just and proper.

## Count IV

### (Breach of Contract – Bismarck Trade Area)

Come now Plaintiffs and for Count IV of their cause of action against Defendant Window World, Inc., state as follows:

103.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein Paragraphs 1 to 78 of Plaintiffs' Complaint.

104.    Plaintiffs and Defendant had a verbal agreement whereby Plaintiffs agreed to provide services to the Bismarck, North Dakota trade area after the licensee abandoned that trade area.

105.    In exchange for Plaintiffs providing those services, Defendant agreed to reimburse Plaintiffs for all costs associated with providing such services.

106.    Plaintiffs fully performed under the verbal agreement between the parties.

107.    Plaintiffs incurred costs in excess of $100,000.00 as a result of providing services pursuant to the agreement of the parties.

108.    That despite repeated demand, Defendant has failed and refused to pay Plaintiffs for the services provided by Plaintiffs to the Bismarck, North Dakota Trade Area.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), their costs herein expended and for such other relief the Court deems just and proper.

**<u>Demand for Jury Trial</u>**

Plaintiffs hereby demand trial by jury on all counts of their complaint.

      Respectfully submitted,

     _/s/ Jonathan E. Fortman_____
JONATHAN E. FORTMAN
Law Office of Jonathan E. Fortman, LLC
250 St. Catherine Street
Florissant, Missouri  63031
Ph# (314) 522-2312
Fax:  (314) 524-1519
Email: jef@fortmanlaw.com

and

LARRY E. WELCH, JR.
Welch Law Firm, PC
Landmark Center
1299 Farnam Street, Suite 1220
Omaha, Nebrasksa 68102
Ph# (402) 341-1200
Fax (402) 341-1515
Email:  larryjr@welchlawfirm.com

Attorneys for Plaintiffs