UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MIKE BENDFELDT and | ) | |
| BETTY MUHR-BENDFELDT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | Case No. 8:15-cv-00377-JFB-TDT |
| | ) | |
| WINDOW WORLD, INC., a North | ) | **JURY TRIAL DEMANDED** |
| Carolina corporation, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ASSOCIATED MATERIALS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

COME NOW, the Plaintiffs, Mike Bendfeldt and Betty Bendfeldt, and pursuant to Rule

15(a)(1)(B) of the Federal Rules of Civil Procedure, file this Amended Complaint. In support of

Plaintiffs' causes of action, Plaintiffs state as follows:

1.     Plaintiffs Mike Bendfeldt and Betty Muhr-Bendfelt are citizens and residents of

the State of Nebraska. Plaintiffs were previously licensees/franchisees of Defendant Window

World, Inc. with territories in Omaha, Nebraska; Des Moines, Iowa; Denver Colorado; Sioux

Falls, South Dakota; Cedar Rapids, Iowa; Chicago, Illinois; Reno, Nevada; Davenport, Iowa;

Mason City, Iowa; Portland, Oregon; Lincoln, Nebraska; Grand Island, Nebraska; Seattle,

Washington; Fargo, North Dakota; and Wichita, Kansas. All license/franchise agreements were

signed by Plaintiffs individually and by various entities which were wholly owned and operated

by them; Those entities are listed below and have assigned all right, title, and interest to the

claims asserted herein to Plaintiffs, Mike Bendfeldt and Betty Muhr-Bendfelt:

Window World – Cedar Rapids, Inc., Window World – Grand Island, Inc., Window World – Mason City, Inc., Window World – North Dakota, Inc., Window World – Portland, Inc., Window World – Quad Cities, Inc., Window World – Seattle, Inc., Window World, Inc., Window World – Lincoln, Inc., Window World – Omaha, Inc., and Window World- South Dakota, Inc.

2.     Defendant Window World, Inc., ("WW") is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business in the State of North Carolina. WW is generally engaged in the business of selling a license/franchise system to individuals and entities interested in operating a business involving the sale and installation of vinyl replacement windows, doors and siding to the general public. The license/franchise system offered by WW allows individuals and entities to use WW's trademarks, trade dress, and business methods pursuant to the terms and conditions of the license/franchise agreement between WW and its licensees/franchisees.

3.     Defendant Associated Materials, LLC ("AMI") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in the State of Ohio; at all times relevant herein, Defendant AMI operated under the trade name of Associated Materials, Inc. AMI is generally engaged in the business of manufacturing and selling vinyl windows and related accessories within the wholesale market to retailers who, in turn, sell and install windows to the general public.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

4.     WW was founded in 1995 by Leon Whitworth.

5.     WW operates a licensing/franchising system throughout the United States whereby it charges a fee to licensees/franchisees in exchange for the use of WW's trademarks,

trade dress, and business methods. As further alleged herein, although WW has, at various times, presented its contractual arrangement as a "licensee", the arrangement is, in fact, a franchise arrangement whereby the purported licensees agree to pay a fee for the use of WW's trademarks, trade dress, and business methods.

6. WW sold its first "license" in 1997 and began operations in 1998. By 2010, the number of WW "licensees" had grown to around 200 locations throughout the country.

7. Potential WW licensees were led to believe that by executing a license/franchise agreement with WW for a relatively low "license" fee, they would be part of the WW system, could utilize the WW trademarks, trade dress, and business methods, and would have access to the best pricing for windows and related materials due to the volume buying power of the WW system.

8. The terms of the license agreements included various requirements related to the operation of the licensed/franchised business, including a requirement that the licensees could purchase windows and related materials (such as caulk, weather stripping, etc.) only from suppliers approved by WW.

9. Since at least 2000, Defendant AMI had been designated by WW as an approved non-exclusive supplier of vinyl replacement windows to WW licensees/franchisees under AMI's "Alside" brand. At the time that Plaintiffs began operating their WW franchises, WW had also designated other manufacturers as approved suppliers, such that Plaintiffs and other "licensees" had the option to purchase windows and related materials from AMI or from alternative suppliers who were approved by WW, thereby enabling competitive pricing among suppliers.

10. The relationship between WW and AMI grew closer over time until 2007 when WW designated AMI as the exclusive supplier of windows to WW licensees/franchisees. WW

notified Plaintiffs and other licensees/franchisees that they were prohibited from using any alternate suppliers for windows and related accessories.

11.     Upon information and belief, at some point prior to 2007 Leon Whitworth and his son Todd Whitworth acquired stock ownership interest in AMI.

12.     In September of 2007, Todd Whitworth acquired WW from Leon Whitworth and Leon Whitworth's former wife, Marie Whitworth.  The acquisition was accomplished through a redemption of the WW shares of Leon Whitworth and Marie Whitworth.  WW purchased Leon Whitworth's shares for $33 million, payable in $3 million in cash and a promissory note calling for installment payments for the remaining $30 million.  WW purchased Marie Whitworth's shares pursuant to an agreement to pay her $1 million per year for life.  Upon consummation of these transactions, Todd Whitworth assumed the position of Chief Executive Officer of WW.

13.     Upon information and belief, in order to obtain the cash needed to complete the aforementioned purchase of shares, Todd Whitworth secured a loan from AMI.

14.     At no time did WW disclose to Plaintiffs or other WW licensees/franchisees that WW owners held stock in AMI or that AMI had loaned money to WW owners.

**PLAINTIFFS ACQUIRED A NUMBER OF WINDOW WORLD LICENSES**

15.     As set forth in the chart below, from 2001-2009, Plaintiffs entered into a series of "License Agreements" with WW.

| Date of Purchase | Location | Date Closed/Sold |
|---|---|---|
| October 16th, 2001 | Des Moines, IA | 2012 |
| October 16th, 2001 | Omaha, NE | 2013 |
| April 30th, 2004 | Denver, CO | 2004 |
| June 20th, 2005 | Sioux Falls, SD | 2013 |
| June 20th, 2005 (renewal) | Des Moines, IA | 2012 |
| June 20th,2005 | Cedar Rapids, IA | 2012 |
| February 8th, 2006 | South Cook County, IL | 2008 |
| February 8th, 2006 | North Cook County, IL | 2008 |

| August 8th, 2006 | Reno, NV | 2010 |
|---|---|---|
| February 19th, 2007 (renewal) | Omaha, NE | 2013 |
| August 27th, 2007 | Davenport, IA | 2011 |
| October 8th, 2007 | Portland, OR | 2011 |
| December 10th, 2007 | Mason City, IA | 2011 |
| April 15th, 2008 | Lincoln, NE | 2013 |
| April 15th, 2008 | Grand Island, NE | 2012 |
| September 30th, 2008 | Seattle, WA | 2011 |
| June 27th, 2008 | Fargo, ND | 2012 |
| October 19th, 2009 | Wichita, KS | 2013 |

16.     Prior to and at the time those "License Agreements" were executed, WW represented to Plaintiffs that as WW "licensees" they would receive the best possible pricing for windows base upon WW representations made to them.

17.     In addition to the Licensing Agreements executed by Plaintiffs, Plaintiffs also agreed to provide services to the Bimark, North Dakota WW trade area after another WW licensee abandoned the trade area.

18.     In the fall of 2010, WW approached Plaintiffs to request that they assist WW by servicing the Bismark, North Dakota trade area until a permanent licensee could be identified and placed into that area.

19.     Plaintiffs agreed to provide such assistance with the understanding and agreement that they would be reimbursed for costs associated with providing such service.

20.     In fact, Plaintiffs had to hire additional office personnel in order to provide such services.

21.     Plaintiffs provided such services until early 2013.

22.     Despite repeated assurances from WW, Plaintiffs have never received reimbursement for the costs associated with services to the Bismark, North Dakota trade area.

## I. WW Knowingly and Intentionally Failed to Make Required Franchise Disclosures to Plaintiffs and other Window World franchisees

22. In its agreements with individuals and/or entities who have licensed Window World trademarks from WW, WW has specifically structured its relationship in a manner clearly and commonly associated with franchise agreements.

23. WW acknowledges and admits that its relationships with business dealers to whom it licenses Window World trademarks are, and always have been, business relationships in which a franchisor licenses the right to use trademarks to franchisees, thereby creating franchise agreements under federal law, which affords special protections to franchisees such as Plaintiffs.

24. Moreover, throughout the period that WW was selling franchises to Plaintiffs, and others, WW knew that in fact it was selling franchises and knew that, as a result, it was obligated to meet certain statutory obligations, both state and federal, that apply to franchisors and to those in the business of selling franchises. WW's directors and upper management, including Leon Whitworth, Todd Whitworth, and Tammy Whitworth, at all times knew that WW's relationship with its purported "licensees" was, in fact, that of franchisor-franchisee and that WW was therefore bound to make certain disclosures under federal and state law and to comply with other federal and state laws that govern franchisors.

25. Among these is the requirement under federal law that franchisors make a battery of disclosures to persons considering whether to enter into a franchise agreement, which is set out at 16 C.F.R. § 436.1, *et seq.* (the "Franchise Disclosure Rule"). These franchise disclosure rules apply to franchisors, such as WW, and exist to provide transparency that protects franchisees, such as Plaintiffs, who otherwise suffer from inferior bargaining power vis-a-vis trademark owners who seek to induce others to enter into franchise relationships.

26.     The Franchise Disclosure Rule specifically provides that a franchisor's failure to comply with the rule constitutes an unfair or deceptive trade practice.

27.     WW has always met the definition of a "franchisee seller" and a "franchisor" under the Franchise Disclosure Rule, and its relationship with the Window World franchisees, including Plaintiffs, has always met the rule's definition of a "franchise."  WW and its upper management were at all times aware of these facts and that WW had disclosure obligations under federal law.

28.     The disclosures required under the Franchise Disclosure Rule include a range of financial information about the franchisor and existing franchisees, as well as information on over twenty discrete topics, which include the following:

   a.   The initial fees and any conditions under which these fees are refundable, as well as the formula used to calculate initial fees that are not uniform and the factors that determine the amount of the fees. *See* 16 C.F.R. § 436.5(e).

   b.   All other fees that the franchisee must pay to the franchisor. *See* 16 C.F.R. § 436.5(f).

   c.   The franchisee's estimated initial investment. *See* 16 C.F.R. § 436.5(g).

   d.   Important provisions of the franchise, including length of the term, renewal of the term, choice-of-forum clauses, and choice-of-law clauses. *See* 16 C.F.R. § 436.5(q)

   e.   Substantial information about the trademarks licensed to the franchisee. *See* 16 C.F.R. § 436.5(m).

   f.   The franchisee's obligation, if any, to purchase goods from a particular vendor or supplier in operating the franchised business. *See* 16 C.F.R. § 436.5(h).

   g.   For mandated suppliers, identification of any supplier in which an officer of the franchisor owns an interest, and of any supplier from whom the franchisor will or

may derive revenue or other material consideration by virtue of franchisees being required to make purchases from that supplier.  *See* 16 C.F.R. § 436.5(h)(3), (6), (8).

29.     The Franchise Disclosure Rule also requires that before any franchisor unilaterally and materially alters the terms of the basic franchise agreement, it must furnish a copy of the revised agreement at least seven days before execution of the document.

30.     A number of states also have their own disclosure requirements applicable to franchisors and require franchisors to register their franchise offerings with certain state agencies before offering the franchises for sale.

31.     Despite its knowledge of the obligations WW owed as a franchisor to its franchisees and prospective franchisees, WW knowingly, intentionally, and in bad faith failed to make the disclosures required under the federal Franchise Disclosure Rule, both in conjunction with offering new franchise agreements to prospective franchisees, including Plaintiffs, and in conjunction with offering to renew franchise agreements with current and former franchisees, including Plaintiffs.

32.     At no point prior to Plaintiffs' execution of any of the "Licensing  Agreements" did WW comply with these obligations in marketing Window World franchises to potential franchisees, including Plaintiffs, and in structuring its relationships with franchisees, including Plaintiffs.   In particular, WW knowingly and intentionally sold Window World franchises to Plaintiffs and others, and submitted new and materially different franchise agreements to Plaintiffs and other existing Window World franchisees for execution, without making the disclosures required by the Federal Disclosure Rule.   For example, WW's upper management, including Todd Whitworth, participated in internal meetings in which it was acknowledged that WW's relationship with its dealers was that of franchisor-franchisee, not licensor-licensee.

33.     As a result of this misconduct, a number of States have entered orders enjoining WW from selling unregistered franchises. By way of example and without limitation, WW has entered into consent orders in California, Illinois, Washington, Minnesota, Maryland, and Virginia, which in some cases impose civil penalties against WW in addition to requiring WW to offer rescission as part of the injunctive relief prescribed.

34.     With respect to each sale of a Window World franchise to Plaintiffs between 2001 and 2009, WW knowingly, intentionally, and in bad faith failed to comply with the Franchise Disclosure Rule, in form and in substance.

35.     WW failed to meet its disclosure obligations so as to keep hidden from its franchisees and potential franchisees, including Plaintiffs, a range of information about the true nature of the financial arrangement between WW and its franchisees, the true nature of the arrangements between WW and the suppliers required to be used by the franchisees, the true nature, scope, and extent of the revenues WW collects as franchisor from its franchisees, and the true nature of the trademarks licensed to WW's franchises.

36.     WW initially provided lists of approved suppliers to its franchisees, and that included more than one supplier for windows.   For example, on January 22, 2007, Todd Whitworth wrote to all Window World franchisees, informing them that along with caulking, printing, and promotional materials, "other products such as windows, siding and related materials, doors, gutter, gutter protections, and financing must be purchased from the approved vendor. While enforcement of this as it relates to many products has been ignored in the past it will not be in the future."  The list provided with Whitworth's included AMI and "Xact/MI" as approved suppliers of windows and patio doors.

37.     Later in 2007, WW announced that it was moving to a "sole source" supplier of windows and thereafter required that its franchisees purchase vinyl replacement windows only

from AMI.   After that time, Plaintiffs made their wholesale window purchases exclusively from AMI.

38.     Although unknown to Plaintiffs until recently, WW receives a substantial portion of the purchase price its franchisees pay to WW-designated suppliers, including AMI, for products and certain options on those products.    AMI and WW's other designated suppliers provide these sums in the form of a kickback or rebate.    For example, WW received approximately $24 million annually in revenue from WW-designated suppliers in 2011-2013 in the form of kickbacks or rebates.   These amounts result from per-unit rebates provided by the designated supplier with respect to windows, patio doors, siding, and other products, as well as certain options to windows and patio doors, including "LowE," screens, interior laminates, grids, and colors. These undisclosed rebates can total, in the aggregate, more than $30 per window and thus in some cases may exceed the Window World franchisee's margin on the sale of the window at retail.   Over the relevant time period, these kickbacks and rebates supplied nearly all the revenue that WW has collected in the course of its franchising business and totals tens of millions of dollars.

39.     In addition to providing a substantial financial benefit to WW, these undisclosed kickbacks and rebates have inflicted substantial financial harm upon its franchisees by artificially inflating the wholesale price they pay for the products they sell and install.  Upon information and belief, the kickbacks and rebates WW receives represent all or a portion of the volume discount Plaintiffs and other Window World franchisees would otherwise receive from WW-designated suppliers, including AMI, as a rebate.   Thus, in substance and effect it is Plaintiffs and other Window World franchisees who pay as undisclosed commissions the amounts that WW receives from its designated suppliers in the form of these kickbacks and rebates.

40.     Despite the fact that information concerning any financial benefits a franchisor receives as a result of purchases made by its franchisees is a required disclosure item under the Franchise Disclosure Rule, WW failed to disclose these kickback and rebates to Plaintiffs and other Window World franchisees.  In fact, upon information and belief, WW's directors and upper management expressly decided not only that WW would not make these required disclosures but also that WW would hide from its franchisees the undisclosed commissions they pay and the undisclosed kickbacks and rebates WW receives from the suppliers.  By way of example and without limitation, WW made no disclosure of and instead hid from its franchisees the amount of the rebates, the manner in which the rebates were calculated, the products on which rebates were collected, the portions of the purchase prices paid by its franchisees that constitute the rebates, the negotiations underlying the rebates, and the impact of the rebates on the cost of goods sold by its franchisees.

41.     WW failed to make such disclosures (including disclosure of these kickbacks and rebates it was receiving on purchases from AMI and other WW-designated suppliers), which were required by law.

42.     In addition to failing to disclose the nature and extent of the kickbacks or rebates paid by WW's designated suppliers to WW on purchases made from those suppliers by Plaintiffs and other Window World franchisees, WW also failed to disclose other payments made by WW's  designated suppliers to WW, including marketing fund payments and contributions to the Window World family reunion and other Window World events and meetings.

43.     In addition to the foregoing misrepresentations and omissions of material information with respect to the financial aspects of WW's relationship with its franchisees, WW also failed to disclose the stock interests that its principals held in AMI and the loan AMI made.

44.     WW, in bad faith, took affirmative steps to hide from Window World franchisees and potential Window World franchisees, including the Plaintiffs, that WW owed them obligations under federal law as a franchisor. For example, even though WW knew that it was selling franchises to Plaintiffs and other persons, WW cast the franchise agreements it presented to potential franchisees, including the Plaintiffs, as "Licensing Agreements" and purported to disclaim its status as a franchisor in those agreements.

45.     Those agreements, which were prepared by WW and not subject to negotiation, indicated that the business relationship between WW and its franchisee was merely that of a licensor of Window World trademarks and its licensee and that "[n]othing in this Licensing Agreement shall be deemed to create any type of partnership, employment, agency, franchise, or other business relationship other than LICENSOR and LICENSEE." The agreement went on to disclaim any obligation for WW to comply with "statutes, codes, or law and regulations which govern franchises."

46.     WW knew that these assertions in its agreements were false and that it indeed was engaged in the business of selling franchises  and was obligated to comply with "laws and regulations" governing the franchise relationship, including the Franchise Disclosure Rule.

47.     However, it was not until after Plaintiffs executed the various "Licensing Agreements" described above that WW attempted to make _any_ disclosure to its franchisees and potential franchisees concerning the true nature of the financial arrangement between WW and its franchisees and the true nature, scope, and extent of the revenues WW collects as franchisor from its franchisees.   Instead, WW kept secret from Plaintiffs and other Window World franchisees material financial information about the franchise relationship, including the undisclosed amounts WW collected off of the purchases its franchisees made from WW-designated suppliers, including AMI until sometime after October 28th, 2011.

48.     WW has admitted to Window World franchisees, including Plaintiffs, that it was operating illegally before it began making any of the disclosures required by the Franchise Disclosure Rule.  By way of example and without limitation, Mark Bumgartner made such an admission at an Advisory Council meeting in August 2014.

49.     WW took the foregoing actions in bad faith so as to fraudulently induce its prospective franchisees, including Plaintiffs, to purchase Window World franchises and in order to fraudulently induce existing Window World franchisees to execute renewal "Licensing Agreements."

50.     WW's withholding of information that was required to be disclosed under federal law caused Plaintiffs to be ill-informed and fraudulently induced Plaintiffs to execute "Licensing Agreements" with WW.

51.     The foregoing failures by WW to meet its obligations as a seller of franchises, as well as its affirmative misrepresentations and material omissions, constitute unfair or deceptive trade practices, fraudulent misrepresentations, fraudulent omissions, and negligent misrepresentations and have caused injury to Plaintiffs.

52.     WW withheld from Plaintiffs material information concerning the franchise relationship, intending that Plaintiffs would rely upon those material omissions by acquiring franchises from WW and continuing to operate those franchises. Plaintiffs reasonably relied to their detriment on WW's material omissions by paying substantial sums to acquire franchises, by paying inflated wholesale prices thereafter that resulted in funds flowing through to WW, and by expending millions of dollars advertising Window World trademarks, *all* of which benefitted WW substantially.

## II.   WW Failed to Meet Its Obligation to Secure Superior Wholesale Pricing for Plaintiffs and other Window World franchisees

53.    As a result of WW's misrepresentations, concealments, and omissions of the required disclosures, Plaintiffs reasonably formed the expectation that WW, as the franchisor of the Plaintiffs' franchisees, would secure pricing that was more favorable than what would otherwise be available in the market.

54.    The "Licensing Agreements" that Plaintiffs executed specifically provided that WW "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area herein defined."   These agreements further provided that WW "shall use its best efforts to assist LICENSEE in any reasonable manner so as to maintain and, where appropriate, improve upon, the quality, efficiency, and profitability of the operation."

55.    As it turned out, WW has failed to meet its commitment to secure superior wholesale pricing for its franchisees, including the Plaintiffs' franchises.   On the contrary, the amounts these franchisees pay and have paid to their vinyl replacement window supplier, AMI, *exceed* the amounts they would otherwise pay to AMI and to suppliers of comparable products in the relevant markets were they not Window World franchisees.   Similarly, the amounts these franchisees pay and have paid to the suppliers of various related accessory products exceed the amounts they would otherwise pay to suppliers of comparable products in the relevant markets were they not Window World franchisees.

56.    For example, representatives of AMI have admitted that it has sold windows to non-WW retailers at prices lower than those charged to Window World franchisees.

57.     In addition, a former AMI representative has indicated that a window retailer in the Midwest purchases Alside's 4000 windows with LowE/argon for $120, which is cheaper per unit than the price AMI charges the Plaintiffs for the same product.

58.     In addition, in June 2012, another Window World franchisee received an invoice from AMI that was intended for another AMI purchaser.  The invoice, dated June 11, 2012 and addressed to a window retailer with multiple store locations in the Midwest, but who is not a Window World franchisee, reflected a price for Alside's 0201 windows with ETC liners and Climatech-Plus that was $29.74 cheaper per unit than the price AMI charges Window World franchisees for the same product.  This differential increases the cost of goods sold by the Plaintiffs' franchises by more than $1 million per year.

59.     Plaintiffs competed in their market areas with other non-Window World retailers in the market of the sale and installation of replacement windows.  These competitors included small single-unit retailers and multi-unit retailers who existed throughout the market areas Plaintiffs procured from Window World through the purported "License Agreements." Plaintiffs and their competitors each competed for the same customers within the market areas.

60.     The above-market prices that the Window World franchisees have been required to pay to AMI for vinyl replacement windows result from an unlawful contract, combination, and/or conspiracy between WW and AMI.

61.     In addition to above-market prices Window World franchisees have been required to pay - and continue to pay up to the present - for vinyl replacement windows, they have also been required to pay above-market prices to AMI and other suppliers for various accessory products, including caulk, doors, siding, and garage doors.

62.     The above-market prices for these additional products further demonstrate that WW failed to meet its obligation to secure superior wholesale pricing for its franchisees.

### III.     WW Enters into an Unlawful Contract, Combination, or Conspiracy with AMI to Set Prices and in Restraint of Trade

63.     In 2007, WW through Todd Whitworth and other representatives entered into discussions with AMI about the wholesale prices charged to Window World franchisees and the kickback WW received on those sales.   The product of those discussions was a combination, contract, and/or conspiracy among WW and AMI to increase the price Window World franchisees, including the Plaintiffs, would pay to AMI, to increase the undisclosed revenue that WW collected from each purchase its franchisees made from AMI, and to require that Window World franchisees purchase only from AMI.

64.     In particular, in exchange for WW committing to have its franchisees purchase products at wholesale only from AMI and at prices that were higher than they were currently paying, the kickback WW received off of those purchases would increase.   This arrangement materially increased the volume of AMI's sales to WW's franchisees, which resulted in substantial increases in income for both AMI and WW.

65.     For example, in 2011, 2010, 2009, and 2008, AMI's sales to WW and its franchisees represented approximately 13%, 14%, 13%, and 11% of its total net sales, respectively. This represented a marked increase from AMI's customers in prior years, when no individual customer accounted for 10% or more of AMI's total net sales.

66.     After this agreement was reached, WW announced to its franchisees during the 2007 WW "family reunion" that it would be moving to AMI as the "sole source" supplier of windows within the WW network.

67.     Unbeknownst to Plaintiffs at the time, this arrangement would enrich AMI and WW, but harm competition and injure Window World franchisees.

68.     To begin with, this contract, combination, and/or conspiracy meant that the Window World franchisees, including Plaintiffs, were not receiving superior pricing in their markets.  Instead, they paid inflated prices resulting from an arrangement that secured capital and increased cash flow to WW while securing a larger customer base at a higher price for AMI.

69.     The Window World franchisees, including Plaintiffs, were also injured because the contract, combination, and/or conspiracy between WW and AMI reflected price maintenance that benefitted WW and AMI while hurting the Window World franchisees, who were AMI's customers.

70.     The arrangement between WW and AMI also meant that AMI was insulated from the forces of competition by preventing Window World franchisees from seeking other, and more economic, sources for the products they sold at retail.  The arrangement locked in place a substantial volume of purchasers at a fixed price, while preventing them from seeking alternative suppliers, which would work to drive prices lower in the marketplace.

71.     The Window World franchisees, including Plaintiffs, were also injured because the arrangement between WW and AMI resulted in an economic transfer from Window World franchisees to WW and AMI.  As alleged herein, the arrangement resulted in higher wholesale prices paid by the Window World franchisees.  That, combined with the fact that WW fixed the retail price at which its franchisees could sell their products, meant that the arrangement between WW and AMI eroded the margins of the Window World franchisees while enriching WW and AMI.

72.     WW benefitted from its arrangement with AMI through the increased kickbacks and rebates it received.    By withholding material information from the Window    World

franchisees and by misrepresenting to them the quality of the pricing they would have access to as Window World franchisees, WW induced Window World franchisees, including the Plaintiffs, to pay millions advertising the Window World trademarks. This advertising increased goodwill in Window World trademarks and therefore increased the potential value of other Window World franchises that WW sold and exploited as sources of income.

73.     These hidden payments and the secret arrangements between WW and AMI should have been disclosed pursuant to the Franchise Disclosure Rule, but WW failed to do so with respect to the "Licensing Agreements" Plaintiffs executed. Instead, WW withheld this material information from Plaintiffs with the intent that they rely to their detriment on WW's material omissions.

### IV.  Fraudulent Concealment – Tolling of Statute of Limitations

74.     Throughout the relevant period set forth herein, Defendants affirmatively and fraudulently concealed their wrongful conduct from Plaintiffs and all other WW licensees/franchisees.

75.     Plaintiffs and all other WW licensees/franchisees did not discover and could not discover through the exercise of reasonable diligence that Defendants were violating the law as alleged herein until after Defendant WW admitted that it had been operating as a franchisor in violation of the laws of the United States and several states and finally disclosed the nature and extent of the rebates it was receiving from Defendant AMI. Such disclosure did not occur until sometime after October 28, 2011. Plaintiffs and all other WW licensees/franchisees could not have discovered the violations any earlier that that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods

designed to avoid detection. In addition, the conspiracy between the Defendants was by its nature self-concealing.

76. As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs assert the tolling of any applicable statutes of limitation affecting the rights of action of Plaintiffs.

## COUNT I

### (Violation of the Robinson-Patman Act, 15 U.S.C. §13)

Come now, Plaintiffs and for Count I of their cause of action against Defendants Window World, Inc. and Associated Materials, LLC and state as follows:

77. Plaintiffs re-allege and incorporate by reference as if fully set forth herein, paragraphs 1 to 76 of Plaintiffs' complaint.

78. The Robinson-Patman Act, 15 U.S.C. § 13 (the "Act") provides in relevant part as follows:

> It shall be unlawful for any person engaged in commerce…to discriminate in price between different purchasers of commodities of like grade and quality…where the effect of such discrimination may be to substantially lessen competition and tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly received the benefit of such discrimination, or with customers of either of them.

79. Defendant AMI is engaged in commerce throughout the United States in the sale of vinyl replacement windows and accessory materials. AMI has distribution channels throughout the United States, including in or near almost every market where Plaintiffs did business, such that AMI sells its windows and accessories to competitors within Plaintiffs' targeted markets.

80.     The windows sold by Defendant AMI were "commodities" within the meaning of the Robinson-Patman Act, and Plaintiffs and all other WW "licensees" were purchasers of commodities as defined by the Act.

81.     Based upon information known and available to Plaintiffs, Plaintiffs allege that Defendant AMI implemented a systemic and ongoing policy of intentional price discrimination whereby it imposed a "markup" on vinyl replacement windows sold to WW "licensees" that was not charged to other non-licensee purchasers. Thus, for the same grade and quality of vinyl replacement window, WW "licensees" were charged a higher price than their competitors who were not WW "licehbnsees", although there was no legitimate justification for the higher price.

82.     As a direct result, Plaintiffs competed against other window sales and installation businesses who purchased the same AMI windows, but on superior terms and without AMI's markup that was imposed exclusively on sales of windows to WW licensees/franchisees. Because AMI's policy was systemic and ongoing, thousands of sales were made to both favored and disfavored purchasers pursuant to AMI's discriminatory pricing policy.

83.     Defendant charged such higher prices in order to provide kickbacks and other undisclosed payments to WW and its owners.

84.     The higher prices charged to Plaintiffs and other WW "licensees" injured competition among the customers of Defendant AMI who purchased replacement windows.

85.     Defendant WW knowingly received the benefit of such discrimination in the form of kickbacks and payments it received from Defendant AMI which were not disclosed to WW "Licensees."

86.     Plaintiffs and other WW "licensees" were injured by such conduct in that the injury to competition affected their profit margins due to the increased prices charged by

Defendant AMI to Plaintiffs and other WW "licensees" for replacement windows and resulted in loss of profits and sales as a result of the actions of AMI and WW.

87.     The sole purpose of the increased prices was to enable Defendant AMI to provide undisclosed kickbacks to Defendant WW.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendants for treble damages in excess of Seventy-Five Thousand Dollars ($75,000.00), an award of attorneys' fees, and for such other relief the court deems just and proper.

**Count II**
**(Fraud)**

Come now, Plaintiffs and for Count II of their cause of action against Defendant Window World, Inc. state as follows:

88.      Plaintiffs re-allege and incorporate by reference as if fully set forth herein, paragraphs 1 to 76 of Plaintiffs' Complaint.

89.     Plaintiffs executed a series of "Licensing Agreements" with Defendant Window World, Inc.

90.     In those Licensing Agreements, Plaintiffs agreed "that it will sell and install **only and exclusively** those products, goods, equipment, and parts from vendors approved by LICENSOR."

91.     In exchange, Defendant Window World, Inc. represented to Plaintiffs that "LICENSOR shall endeavor to arrange for the supply of the items to LICENSEE at a prices which are less than those charged to non-licensees within the trade area herein defined."

92.     At the time that Defendant Window World, Inc., made the aforementioned written representation in each of the Licensing Agreements and subsequent renewals executed by Plaintiffs, it knew the representations were false at least regarding the replacement windows

supplied by AMI in that Defendant Window World, Inc. knew that due to the rebates and kickbacks paid to Defendant Window World, Inc. by AMI that the prices charged to Window World licensees/franchisees for replacement windows actually exceeded the prices charged to non-licensees for the same window.

93.     Plaintiffs were induced into entering into and subsequently renewing the Licensing Agreement because they believed that as a licensee of Defendant Window World, Inc. they would receive beneficial pricing for replacement windows.

94.     Plaintiffs justifiably relied upon the representations made by Defendant in the Licensing Agreements in making their decision to execute and renew the Licensing Agreements.

95.     As a direct and proximate result of the fraudulent misrepresentations made by Defendant Window World, Inc. to induce Plaintiffs to enter into and subsequently renew the Licensing Agreements Plaintiffs sustained damage in that the prices they were required to pay to required suppliers as mandated by Defendant were higher than what Plaintiffs would have paid had they not entered into Licensing Agreements with Defendant.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant Window World, Inc., for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), an award of punitive damages, their costs herein expended, and for such other relief the court deems just and proper.

## Count III

### (Breach of Contract – Licensing Agreements)

Come now, Plaintiffs and for Count III of their cause of action against Defendant Window World, Inc., state as follows:

96.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein Paragraphs 1 to 76 of Plaintiffs' Complaint.

97.     Pursuant to the Licensing Agreements executed by and between Plaintiffs and Defendant, Defendant agreed that it "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area…"

98.     Defendant breached the duty owed to Plaintiffs under the foregoing provisions of the Licensing Agreement in that Defendant did not "endeavor" to arrange for pricing of supplies such as replacement windows which were less than the prices charged to non-licensees in the trade areas operated by Plaintiffs.

99.     Instead, Defendant conspired with AMI for AMI to charge higher prices to Plaintiffs and other Window World licensees so that Defendant would receive a kickback or rebate from AMI, thereby breaching its explicit duties under the contract, as well as the duty of good faith and fair dealing.

100.    As a result of Defendant's breach of the Licensing Agreements as aforesaid, Plaintiffs were damaged in that the prices charged to them for supplies such as replacement windows were higher than were charged to Plaintiffs' competitors within the trade areas operated by Plaintiffs.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant Window World, Inc., in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), their costs herein expended, and for such other relief the Court deems just and proper.

## Count IV

### (Breach of Contract – Bismarck Trade Area)

Come now, Plaintiffs and for Count IV of their cause of action against Defendant Window World, Inc., state as follows:

101.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein Paragraphs 1 to 76 of Plaintiffs' Complaint.

102.     Plaintiffs and Defendant had a verbal agreement whereby Plaintiffs agreed to provide services to the Bismarck, North Dakota trade area after the licensee abandoned that trade area.

103.     In exchange for Plaintiffs providing those services, Defendant agreed to reimburse Plaintiffs for all costs associated with providing such services.

104.     Plaintiffs fully performed under the verbal agreement between the parties.

105.     Plaintiffs incurred costs in excess of $100,000.00 as a result of providing services pursuant to the agreement of the parties.

106.     That despite repeated demand, Defendant has failed and refused to pay Plaintiffs for the services provided by Plaintiffs to the Bismarck, North Dakota Trade Area.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), their costs herein expended and for such other relief the Court deems just and proper.

## Count V

### (Violation of Sherman Antitrust Act – 15 U.S.C §1)

Come now, Plaintiffs and for Count V of their cause of action against Defendants Window World, Inc. and Associated Materials, LLC and state as follows:

107.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein, paragraphs 1 - 76 of Plaintiffs' complaint.

108.     At the time that Plaintiffs entered into their first "License Agreement" with WW, there were multiple approved suppliers of replacement windows and associated materials.

109.    In and around 2007, WW mandated that its "licensees" utilize AMI as their sole and exclusive source for replacement windows.

110.    At the time that Plaintiffs became WW "licensees," they had no knowledge of a potential switch by WW to a sole supplier for replacement windows and associated materials, and could not have reasonably anticipated that WW would switch to a single supplier of replacement windows and associated materials.

111.    At the time WW mandated a single supplier for replacement windows, Plaintiffs were locked in as WW "licensees." If Plaintiffs failed to purchase from AMI, the sole approved supplier of replacement windows, they would have violated the terms of the "License Agreements" which would have resulted in their termination as "licensees". Such termination would have resulted in a substantial loss of their personal and financial investment in their businesses, and Plaintiffs would have been bound by a restrictive non-compete agreement which would have, in effect, ended their ability to operate as a retailer of replacement windows in their market areas.

112.    Defendant AMI became the sole approved supplier for replacement windows throughout the WW system, which operated in various market areas throughout the United States.

113.    By virtue of Plaintiffs and other WW "licensees" being locked in after entering into "License Agreements" with WW, the relevant market for purpose of Plaintiffs cause of action is the operation of a WW licensed trade area.

114.    As a result of WW switching to a single supplier for replacement windows, Defendant AMI was able to raise prices thereby increasing its profits and increasing the amount of kickbacks paid to WW.

115.    Through use of the restrictions contained in its "Licensing Agreements", WW had sufficient economic power to appreciably restrain competition in the market for replacement windows and associated materials.

116.    WW's requirement that its "licensees" utilize AMI as the sole supplier for replacement windows had an anticompetitive effect in that it prevented other suppliers of replacement windows from competing for the business of WW "licensees", and offering pricing that may have been more favorable that the artificially high prices at which AMI was selling windows to WW "licensees".

117.    The amount of commerce affected by the conduct of Defendants WW and AMI is substantial in that the illegal and improper agreement between WW and AMI, whereby WW franchisees were forced to purchase windows and materials exclusively from AMI, resulted in purchases of windows by WW franchisees from AMI that are reasonably believed to be in the hundreds of millions of dollars.

118.    WW's requirement that Plaintiffs purchase replacement windows only from AMI, imposed only after they had signed the "License Agreements" and without proper disclosure such that Plaintiffs would anticipate such requirement, constituted an illegal tying arrangement in violation of the Sherman Act, 15 U.S.C. § 1.

119.    Under the illegal tying arrangement, WW's "license" for use of its trademarks, trade dress and business methods was the "tying" product, and AMI's windows and associated materials served as the "tied" product.

120.    Due to the arrangement between WW and AMI resulting in AMI being chosen as the sole approved supplier of replacement windows to WW "licensees," both WW and AMI received a direct economic benefit from the illegal tying arrangement.

121. As a result of this illegal tying arrangement, Plaintiffs and other WW "licensees" paid higher prices for replacement windows resulting in reduced profits for Plaintiffs and higher costs for Plaintiffs' customers. Plaintiffs were required to spend hundreds of thousands of dollars in increased costs for replacement windows as a result of the illegal tying arrangement.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendants in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), an award of treble damages, their attorneys' fees and costs herein expended, and for such other relief the court deems just and proper.

## Count VI

### Racketeer Influenced and Corrupt Organizations Act (RICO)
### Violation of 18 U.S.C. §1962(c)

Come now, Plaintiffs and for their cause of action against Defendants state as follows:

122. Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and every allegation contained in paragraphs 1 to 76 of this Complaint.

123. Defendants WW and AMI have violated the civil provisions of the RICO Statue as described below.

124. Under 18 U.S.C. § 1964(c) "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys' fee…"

125. Under 18 U.S.C. § 1961(3) a "person" for the purposes of the Civil RICO Statute is defined as "any individual or entity capable of holding a legal or beneficial interest in a property."

126. Under 18 U.S.C. § 1961(4) the term "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

127.     WW, AMI and Plaintiffs are "persons" within the meaning of the RICO Statute. The association between WW and AMI constitutes an "enterprise."

128.     Under 18 U.S.C. § 1962 (c) it is unlawful for any person to conduct or participate in the conduct of the affairs of an enterprise that is engaged in or affects interstate or foreign commerce through a pattern of racketeering activity or collection of unlawful debt.

129.     The relationship between WW and AMI constitutes an association-in-fact enterprise under 18 U.S.C. §1961(4) in that: (a) there is a common and/or shared purpose among the members; (b) there is continuity of structure and personnel; and (c) there is an ascertainable structure distinct from that inherent in the pattern of racketeering.

130.     The enterprise is separate and distinct from the Defendants that participated in the enterprise and directed its affairs.

131.     The structure of the enterprise is imposed by the License Agreements between WW and its "licensees" and the agreement concerning payments from AMI to WW.

132.     There are aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal.

133.     The enterprise affects interstate commerce in a variety of ways including the use of interstate communications to defraud and deceive Plaintiffs and affect interstate commerce in that the amounts received by AMI and WW were based on the sale and purchase of items that crossed state lines.

134.     The Defendants conduct the affairs of the enterprise, as opposed to merely their own affairs by, among other things, fraudulently inducing Plaintiffs to enter into 'License Agreements" in order to hide the amount of kickbacks paid by AMI to WW.

135.     Defendants participated in the conduct of the enterprise through inducing the purchase of "licenses" and the purchase of replacement windows from AMI through misrepresentation that the replacement windows were being sold at the best available price.

136.     Defendants are engaged in an ongoing pattern of racketeering activity as defined by 18 U.S.C. §1961(5).

Case 5:17-cv-00039-KDB-DCK     Document 29     Filed 02/19/16     Page 28 of 32

137.    The pattern of racketeering activity of Defendant consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of the prior act of racketeering activity.   Acts of racketeering activity occurred each and every time WW sold a "license," each and every time WW licensees such as Plaintiffs made payment of an inflated amount for purchase of replacement windows from AMI, and each and every time that AMI made payments to WW. Thus, there are thousands of predicate acts of racketeering activity utilizing mail and wire transmissions.

138.    Defendants have violated and continue to violate 18 U.S.C. §1341 in that Defendants: (a) devised a plan to scheme or defraud the WW licensees such as Plaintiffs; (b) intended to defraud licensees, (c) should have reasonably foreseen that the mail would be used; and (4) used the U.S. Postal Service or equivalent private carrier to further the scheme.

139.    Defendants have violated and continue to violate 18 U.S.C. §1343 in that defendants: (a) devised a plan to scheme or defraud the WW licensees such as Plaintiffs; (b) intended to defraud WW licensees such as Plaintiffs, (c) should have reasonably foreseen that wires would be used; and (4) used wires to further the scheme.

140.    Each violation of 18 U.S.C §1341 and §1343 constitutes an act of racketeering.

141.    The acts of racketeering activity of Defendants have the same or similar methods.

142.    The acts of racketeering activity committed by Defendants has the same or similar objective: namely to force WW licensees to pay inflated prices to AMI in order to increase the profits of AMI and the amount of kickbacks paid by AMI to WW.

143.    The acts of racketeering activity committed by Defendants have the same victims, all WW licensees such as Plaintiffs.

144.    The acts of racketeering activity involving Defendants involve a distinct threat of long term racketeering activity.

145.    The practice of Defendants in knowingly and intentionally misrepresenting the true nature of the WW system and the true nature of the relationship between WW and AMI has continued, is ongoing, and will continue into the future unless halted by judicial intervention.

146.    Defendants' intentional misrepresentation of the true nature of the WW system and the true nature of the relationship between WW and AMI is part of the enterprise's regular way of conducting business.

147.    Defendants' pattern of racketeering activity has caused Plaintiffs to invest into a system much different than the system represented to them by Defendants and purchase replacement windows at an inflated cost.

148.    Plaintiffs have suffered an injury to their business and/or property in that as a result of Defendants' violations of 18 U.S.C § 1962(c) Plaintiffs were fraudulently induced into entering into "License Agreements" with WW and pay inflated prices to AMI for replacement windows as a result of Defendants' racketeering activity.

149.    The unlawful conduct of  Defendants has allowed Defendants to earn and/or retain significant funds to which they are not entitled, including the amounts paid to AMI which were then paid to WW in the form of kickbacks and undisclosed ongoing franchise fees.

150.    As a direct and proximate result of Defendants' violations of 18 U.S.C. 1962(c), Plaintiffs have suffered damages in an amount undetermined at this time but in excess of $75,000.

WHEREFORE, for the foregoing reasons, Plaintiffs pray this Court enter judgment in their favor, award treble damages, award attorneys' fees, award their costs herein expended, and for such other relief the court deems just and proper.

## Count VII

### Racketeer Influenced and Corrupt Organizations Act (RICO)
### Violation of 18 U.S.C. §1962(d)

Come now Plaintiffs, and for their cause of action against Defendants state as follows:

151.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and every allegation contained in paragraphs 1- 76 of this Complaint.

152.    Under 18 U.S.C. § 1962(d) it is unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

153. As set forth in Count VI, Defendants agreed and conspired to violate 18 U.S.C. §1962(d). Specifically, Defendants engaged in a willful pattern and practice of misrepresenting the true nature of the relationship between WW and Plaintiffs in order to hide the amount of kickbacks WW received from AMI and others and misrepresenting that "licensees" would obtain preferential pricing of replacement windows in order to fraudulently induce Plaintiffs into entering "License Agreements."

154. The Defendants have intentionally conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

155. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes aforementioned schemes in violation of 18 U.S.C. §1962(d).

156. As a direct and proximate result of the Defendants conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), Plaintiffs have been injured in their business and property in that Plaintiffs were fraudulently induced into entering "License Agreements" and paying inflated prices for replacement windows in order to permit AMI to gain substantial profits and in order to permit AMI to pay undisclosed kickbacks to WW.

157. Specifically, Plaintiffs have been deprived of the amount of money that WW and AMI have obtained unlawfully by reason of the conspiracy.

158. As a direct and proximate result of the violations of 18 U.S.C. § 1962(d) by WW and AMI, Plaintiffs have suffered damages in an amount undetermined at this time but in excess of $75,000.

WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of all others similarly situated, pray this Court enter judgment in their favor in Count VII of their Complaint, treble damages, an award of attorneys' fees, their costs herein expended, and for such other relief the court deems just and proper. Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

## Demand for Jury Trial

Plaintiffs hereby demand trial by jury on all counts of their complaint.

Respectfully submitted,

    /s/ Jonathan E. Fortman
Law Office of Jonathan E. Fortman, LLC
250 St. Catherine Street
Florissant, Missouri  63031
Ph# (314) 522-2312
Fax:  (314) 524-1519
Email: jef@fortmanlaw.com

and

LARRY E. WELCH, JR.
Welch Law Firm, PC, Landmark Center
1299 Farnam Street, Suite 1220
Omaha, Nebraska 68102
Ph# (402) 341-1200
Fax (402) 341-1515
Email:  larryjr@welchlawfirm.com

Attorneys for Plaintiffs

## Certificate of Service

A true and accurate copy of the foregoing has been served upon all parties via operation of the Court's ECF filing system this 19th day of February, 2016.

                /s/ Jonathan E. Fortman