IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:17CV39-GCM

| MIKE BENDFELDT and BETTY MUHR-BENDFELDT, | ) ) ) | |
|---|---|---|
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER |
| WINDOW WORLD, INC., a North Carolina Corporation and ASSOCIATED MATERIALS, LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court upon Defendants' Motions to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. Nos. 35 and 37). These motions have been fully briefed and are ripe for disposition.

## I.     FACTUAL BACKGROUND

Plaintiffs, Mike and Betty Bendfeldt, entered into a series of "License Agreements"[1] with Defendant Window World, Inc. ("WW") between 2001 and 2009. (Am. Compl. ¶ 15). WW operated a "licensing" system involving the sale and installation of replacement windows. (*Id*. at ¶ 5). Under the License Agreements, Plaintiffs were led to believe that they would be part of the Window World system, could utilize the WW trademarks, trade dress and business methods and would have access to the best pricing for windows and related materials due to the volume-buying power of the WW system. (*Id*. at ¶ 7). The License Agreement contained a provision requiring that Plaintiffs and other Licensees purchase windows and related materials only from

---

[1] Plaintiffs allege that the "licensing agreements" were actually "franchise agreements" thereby subjecting WW to franchise disclosure rules. *See* 16 C.F.R. § 436.1, *et seq*.

1

suppliers approved by WW. (*Id*. at ¶ 8). Originally, WW permitted franchisees to buy windows from more than one supplier, including Defendant Associated Materials, LLC ("AMI"). AMI had been one of the WW-approved suppliers of replacement windows to WW licensees since at least 2000. (*Id*. at ¶ 9).

In 2007, WW announced that it had designated AMI as its exclusive supplier of windows. (*Id*. at ¶ 37). Plaintiffs allege that WW received "rebates" from AMI for every window sold by AMI, the nature and extent of which were not fully disclosed to WW Licensees. (*Id*. at ¶ 47). In addition, instead of ensuring that WW Licensees received superior pricing, the agreement between Defendants WW and AMI actually resulted in prices much higher than prices charged to non-WW retailers. However, the Plaintiffs continued to buy several franchises long after WW designated AMI as its exclusive window supplier. (*Id*. at ¶ 15).

In 2011, Defendant WW admitted to its Licensees that the relationship of the parties was, and always had been, a franchise relationship. (*Id*. at ¶ 23). Plaintiffs allege that Defendant WW intentionally misled its "Licensees," in order to avoid certain disclosure requirements of the Federal Trade Commission and various state regulations including the requirement that the franchisor (WW) disclose whether it receives any consideration from a mandated supplier. (*Id*. at ¶¶ 25-28). It was only after WW admitted that it had been selling franchises that Plaintiffs discovered that a large part of the revenue of WW was derived from kickbacks it received from suppliers such as Defendant AMI.

Plaintiffs[2] filed this lawsuit seeking recovery against Defendants under a variety of legal theories. Count I of the Amended Complaint seeks recovery for violation of the Robinson-Patman Act for competitive injury due to the disparate prices charged by Defendant AMI. Count

---

[2] The Bendfeldts allege that they are assignees of claims from ten former Licensees/franchisees of WW that they once wholly owned and operated. (Am. Compl. ¶ 1).

V seeks recovery for violations of the Sherman Antitrust Act. Counts VI and VII seek recovery alleging violation of the Racketeer Influenced and Corrupt Organization Act (RICO). This case was originally filed in the federal district court in Nebraska and transferred to this Court upon motion of the Defendants on the basis of forum selection clauses and the doctrine of forum non conveniens. Defendants have filed separate Motions to Dismiss Counts I, V, VI and VII pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. DISCUSSION

### A. Standard of Review

To survive a motion to dismiss, the Bendfeldts must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This evaluation is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). This "plausibility" standard is "more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678. Pleading facts that could conceivably support a finding of liability is insufficient. *Twombly*, 550 U.S. at 547; *Iqbal*, 556 U.S. at 680.

The Court should not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Neither formulaic recitations of legal elements nor naked assertions devoid of factual enhancement will do. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

### B. Robinson-Patman Act (Count I)

The Robinson-Patman Act provides in pertinent part:

It shall be unlawful for any person engaged in commerce…to discriminate between different purchasers of commodities of like grade and quality…where the effect of

3

such discrimination may be substantially to lessen competition or tend to create monopoly in any line of commerce or to injure, destroy, or prevent discrimination with any person who either grants or knowingly receives the benefit of such discrimination or with customers of each of them…

15 U.S.C. §13(a).

Plaintiffs allege what is referred to as a "secondary line" violation of Section 2(a) of the Robinson-Patman Act. "Secondary-line cases . . . involve price discrimination that injures competition among the discriminating seller's customers . . . ; cases in this category typically refer to 'favored' and 'disfavored' purchasers." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006). In other words, the Bendfeldts contend that Defendants' alleged discrimination injured competition between the Bendfeldts as customers of AMI, and other retailer customers who allegedly received lower prices from AMI.

In order to prevail on a claim for secondary-line injury, Plaintiffs must establish: (1) that the relevant window sales were made in interstate commerce; (2) that the windows were of "like grade and quality;" (3) that Defendant AMI discriminated in price between Plaintiffs and other purchasers of AMI windows; and (4) that the effect of such discrimination was to injure, destroy or prevent competition to the advantage of such other purchasers. *Id.* at 176-77. Defendants argue that Plaintiffs cannot prevail on this claim because they cannot establish the fourth element.

In order to establish the competitive injury required under the Act, Plaintiffs must be able to establish actual competition "for the same dollar" with the "favored" AMI retailers who allegedly received the lower prices. *See id.* at 177 ("A hallmark of the requisite competitive injury, our decisions indicate, is the diversion of sales or profits from a disfavored purchaser to a favored purchaser. . . . Absent *actual competition* with a favored [customer], however, [a plaintiff] cannot establish the competitive injury required under the Act." (emphasis added)).

4

Nowhere in the Amended Complaint are there allegations of actual competition for "the same dollar."[3] Plaintiffs allege that retailers in locations that are unidentified, or identified only as being somewhere "in the Midwest," or "throughout the United States," allegedly received lower prices from AMI than did the Bendfeldt retailers. But nowhere do the Plaintiffs identify any Bendfeldt retailer that actually competed with or lost sales to any favored retailer.

The facts in *Reeder-Simco* are instructive. There, the plaintiff truck dealer alleged that the manufacturer granted larger discounts to dealers that sold trucks to different customers than those the plaintiff bid for. The Supreme Court held that the plaintiff could not transplant allegedly discriminatory discounts from transactions for which it did not compete into transactions for which it did in fact compete. "We decline to permit an inference of competitive injury from evidence of such a mix-and-match, manipulable quality." *Id*. at 178. In *Reeder-Simco*, the mere presence of allegedly lower prices in the same general geographic area—an allegation that the Plaintiffs do not even make—was insufficient to support a claim. The plaintiff had the burden to allege that the favored and disfavored customers "in fact competed for the same customer-tailored sales." *Id*. at 179.[4]

Plaintiffs contend that their Amended Complaint sufficiently alleges that Plaintiffs competed with favored retailers. They cite paragraph 82 where they allege that as a direct result of the Robinson-Patman violation, "Plaintiffs competed against other window sales and

---

[3] In fact, the Amended Complaint demonstrates the absence of competition. The Amended Complaint relies on a misdirected invoice that allegedly shows that a non-Window World retailer received a lower price from AMI than did the Bendfeldt retailers. That invoice, however, was intended for a retailer 500 miles away from the nearest Bendfeldt retailer in this case—a distance so great as to preclude competition in such a localized business as home window installation.

[4] Several circuit courts of appeals have held the same. *See Feesers, Inc. v. Michael Foods, Inc*., 591 F.3d 191, 197 (3d Cir. 2010) (holding that held that "two parties are in competition only where, after a 'careful analysis of each party's customers,' we determine that the parties are '*each directly after the same dollar*.'. . . We refer to this dollar-for-dollar analysis as the competing purchaser requirement.")(citations omitted; emphasis added); *see also Godfrey v. Pulitzer Publ'g Co.*, 276 F.3d 405, 410 (8th Cir. 2002); *Best Brands Beverage, Inc. v. Falstaff Brewing Corp*., 842 F.2d 578, 584 (2d Cir. 1987); *M.C. Mfg. Co. v. Texas Foundries, Inc*., 517 F.2d 1059, 1068 (5th Cir. 1975).

installation businesses who purchased the same AMI windows, but on superior terms and without AMI's markup that was imposed exclusively on sales of windows to WW licensees/franchisees." Moreover, they cite paragraph 59 in which they allege that "Plaintiffs and their competitors each competed for the same customers within the market area." They argue that these allegations are more than sufficient to satisfy the pleading requirements of Rule 8(a)(2), and that they have no burden to identify any disfavored Bendfeldt retailer, any favored AMI customer, any "market area" where competition took place, or the amount or duration of any supposed discrimination.

Plaintiffs' argument ignores the many cases in which courts, including this Court, have routinely dismissed Robinson-Patman Act claims for failing to allege these very elements. *See Mkt. Choice, Inc. v. New England Coffee Co.*, No. 5:08-CV-90, 2009 WL 2590651, at *11-12 (W.D.N.C. Aug. 18, 2009) (holding that the plaintiff had failed to state a plausible claim under the Robinson-Patman Act because the amended complaint "lacks any factual allegations identifying the particular goods involved, the retailers affected, the actual injury to affected retailers, or the circumstances of the sales transactions involved."); *United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 396 (S.D.N.Y. 2001) ("It is unclear from the Amended Complaint as to which plaintiffs faced competition from which of the wholesalers for sales of the same commodities. Plaintiffs may not state a claim by glossing over these factual requisites with a conclusory allegation of competition."); *see also GLM Sec. & Sound, Inc. v. LoJack Corp.*, No. 10-CV-4701 (JS)(ARL), 2011 WL 4594825, at *14-15 (E.D.N.Y. Sept. 30, 2011); *Fresh N' Pure Distribs., Inc. v. Foremost Farms USA*, No. 11-C-470, 2011 WL 5921450, at *5 (E.D. Wis. Nov. 28, 2011); *Dayton Superior Corp. v. Spa Steel Prods., Inc.*, No. 1:08-CV-1312 (FJS/RFT), 2010 WL 3825619, at *9-10 (N.D.N.Y. Sept. 24, 2010).

Because Plaintiffs have failed to allege actual competition for the "same dollar," Count I must be dismissed.[5]

### C. Sherman Act (Count V)

Count V of the Amended Complaint purports to allege a claim for an unlawful tying arrangement under Section 1 of the Sherman Act because the Bendfeldts' agreement with WW required them to buy windows exclusively from AMI. "A tying arrangement is 'defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.' Tying suppresses competition in two ways: 'First, the buyer is prevented from seeking alternative sources of supply for the tied product; second, competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement.'" *It's My Party, Inc. v. Live Nation, Inc*., 811 F.3d 676, 684 (4th Cir. 2016) (internal citations omitted). The Amended Complaint alleges that WW's "'license' for use of its trademarks, trade dress and business methods was the 'tying' product and that [AMI's] windows and associated materials served as the 'tied' product." (Am. Compl. ¶ 119.)[6]

An essential element of an unlawful tying agreement is market power in the tying product. "Rather than relying on assumptions, in its more recent opinions the Court has required a showing of market power in the tying product." *Ill. Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 35 (2006). "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Id*. at 46.

As an initial matter, the unlawful tying claim against AMI cannot stand. The Amended Complaint does not allege that AMI tied any sale to any other sale. AMI sold windows and

---

[5] Because the Court has concluded that Plaintiffs have failed to state a claim, it is unnecessary for the Court to reach the Defendants' other arguments as to this claim.
[6] It is well settled that a franchise license can be a tying product. *Little Caesar Enters., Inc. v. Smith*, 34 F. Supp. 2d 459, 467 (E.D. Mich. 1998).

accessories; it offered no franchise or license to anyone. The Amended Complaint alleges only that AMI sold the "tied" product and never alleges that it sold the "tying" product of the WW license, let alone had market power in a product it never sold. Accordingly, the claim as against AMI must be dismissed.

With regard to WW, the issue is whether WW had the requisite market power in the tying product — window franchises. Plaintiffs argue that the relevant tying market is not the broader market in which the franchise operates (window replacement companies), but the narrow market of the WW franchisees themselves. They assert that WW exercised market power over its franchisees by locking them into the licensing/franchise agreements and then subsequently requiring that they purchase windows from AMI only. This "lock-in" theory is derived from the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451 (1992). In *Kodak*, the defendant Eastman Kodak Co. manufactured and sold copiers and micrographic equipment, and also sold unique service and replacement parts for its products. *Kodak*, 504 U.S. at 456-57. The Plaintiffs were a group of independent service organizations ("ISOs") that serviced and repaired Kodak equipment. *Id*. at 457. Kodak subsequently adopted a policy that it would only sell replacements parts to buyers of Kodak equipment who use Kodak to service or repair their machines. *Id.* at 458. Kodak also took other steps to restrict the availability of Kodak parts to make it more difficult for the ISOs to service Kodak machines. *Id.* The ISOs were unable to obtain replacement parts and many were forced out of business. *Id*. The ISOs sued Kodak for antitrust violations, alleging that Kodak unlawfully tied the sale of service for Kodak machines to the sale of parts, thereby "locking in" those customers that had purchased its machines. The Court upheld the denial of Kodak's summary judgment motion, concluding that "[b]ecause service and parts for Kodak equipment are not interchangeable with other

manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id.* at 482. Plaintiffs' theory is that after locking in their customers-franchisees, WW changed its policy regarding the "locked-in" customer-franchisees to require that the franchisees acquire windows (tied product) from AMI at a marked-up price for which WW obtained a kick-back. In such cases, Plaintiffs contend, the tying market is the narrow market of the WW franchisees, over which WW has exclusive economic power and Plaintiffs have none.

Plaintiffs' "lock-in" theory fails for a several reasons. First of all, *Kodak* did not involve a franchise network like this case. In *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430 (3d Cir. 1997), the Third Circuit considered the *Kodak* decision within the franchise context. *Queen City Pizza* involved Domino's pizza franchisees who alleged that Domino's violated antitrust laws by, *inter alia*, requiring its franchisees to buy only Domino's-approved pizza ingredients and supplies rather than obtain them from another source, or manufacture the ingredients themselves, at a more favorable price. *Queen City Pizza*, 142 F.3d at 433-34. The franchisees, relying on *Kodak*, argued that they were "locked in" to their position as Domino's franchisees and thus the relevant market for antitrust purposes was the market for ingredients and supplies among Domino's franchisees. *Id*. at 439. The *Queen City Pizza* court distinguished *Kodak* from the typical franchise arena. *Id*. at 440. In *Kodak*, the purchasers of Kodak equipment could not have foreseen Kodak's change in policy such that they could have "calculate[d] the higher costs at the time of purchase and incorporate[d] them into their purchase decision." *Id.* In contrast, the *Queen City Pizza* plaintiffs:

> knew that Domino's retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail in . . . the franchise agreement. Unlike the plaintiffs in *Kodak*, the Domino's

9

franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement.

*Id*. at 440. Unlike in *Kodak*, the plaintiffs didn't buy Domino's-approved supplies and ingredients because they were unique, but because they were obligated to do so by virtue of their franchise agreements.

The Plaintiffs herein are like the Domino's franchisees in *Queen City Pizza*. The Bendfeldts knew from the moment they signed their agreements that WW could change the number and identity of approved window suppliers. They admit that they agreed to buy windows only from WW-approved suppliers: "The License Agreement required that Plaintiffs and other Licensees purchase windows and related products only from suppliers approved by WW." (Am. Compl. ¶ 8.) In other words, Plaintiffs were on notice that WW could designate one approved window supplier if it wished to do so. *See Little Caesar Enters., Inc. v. Smith*, 34 F. Supp. 2d 459, 507 (E.D. Mich. 1998) (holding that disclosures were sufficient if "when evaluated in light of other generally known or readily available information, [they] *would put a reasonably prudent franchise purchaser on notice of the risk* that logoed goods would be tied in with the franchise having no contractual or other limitations on price.") (emphasis added); s*ee also Mumford v. GNC Franchising LLC*, 437 F. Supp. 2d 344, 356-57 (W.D. Pa. 2006) (franchise agreements "contemplated" exclusive supplier by, *inter alia*, requiring franchisor approval of products to be sold).

Plaintiffs' argument there was more than one approved supplier when they entered into their first franchise agreement does not change the fact that they were aware that they were committed to WW's suppliers from the start. The Bendfeldts knew and agreed that WW had the authority to limit their choice of window suppliers. The Bendfeldts do not argue that WW's change violated their agreements, that those agreements required a minimum number of

suppliers, or that they prevented WW from designating a single supplier. The Bendfeldts could have negotiated for an agreement that assured them alternative suppliers or could have sought a business arrangement with another franchisor more to their liking. *See Queen City Pizza*, 124 F.3d at 440.

Moreover, the Amended Complaint alleges that WW "announced" the designation of AMI as exclusive supplier in 2007. With this knowledge, the Bendfeldts purchased three franchises in late 2007, four in 2008, and one in 2009. In short, the Bendfeldts bought all of their franchises well aware that their choice of suppliers could be restricted to a single supplier, and bought at least five franchises (and likely three more) with the certain knowledge that their options were in fact limited to AMI.

Courts have routinely dismissed analogous claims where the alleged market power flows not from dominance of a product or service market, but from a contractual obligation to a franchisor. "[W]here the defendant's 'power' to 'force' plaintiffs to purchase the alleged tying product stems not from the market, but from plaintiffs' contractual agreement to purchase the tying product, no claim will lie." *Queen City Pizza*, 124 F.3d at 440, 443 ("Franchisees must buy Domino's-approved supplies and ingredients not because they are unique, but because they are obligated by contract to do so."). The case law is overwhelming on this issue. *E.g.*, *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 973 (9th Cir. 2008) ("[T]he complaint's allegation of a contractual franchise relationship also fails to plead market power. A tying claim generally requires that the defendant's economic power be derived from the market, not from a contractual relationship that the plaintiff has entered into voluntarily."); *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) (same); S*chlotzky's, Ltd.*

11

*v. Sterling Purchasing and Nat. Distrib. Co*., 520 F.3d 393, 408 (5th Cir. 2008) (same); *Maris Distributing Co. v. Anheuser-Busch, Inc*., 302 F.3d 1207, 1222 (11th Cir. 2002) (same).

The Court concludes that Plaintiffs have failed to meet their burden of alleging a valid relevant market over which WW held market power. Accordingly, their Sherman Act claim must be dismissed.

### D. RICO Claims (Counts VI and VII)

The Court notes that "particular care is required" when evaluating a RICO claim at the Rule 12 stage to prevent "abusive or vexatious treatment of defendants." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991). "[P]laintiffs wielding RICO almost always miss the mark. Accordingly, courts have expressed skepticism toward civil RICO claims." *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, Inc., 17 F. Supp. 3d 207, 220-21 (E.D.N.Y. 2014) (citation omitted).

Plaintiffs allege that Defendants violated the civil provisions of the RICO statute by conducting or participating in the conduct of the affairs of an enterprise that is engaged in or affects interstate or foreign commerce through a pattern of racketeering activity or collection of an unlawful debt. To state a RICO claim, a plaintiff must plead conduct of an enterprise through a pattern of racketeering activity, including at least two predicate acts. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985); 18 U.S.C. §§ 1961(5), 1962(c). Plaintiffs base their RICO claim on what they allege to be predicate acts of mail and wire fraud. *See* Am. Compl. ¶¶ 138 - 39. "When pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999). "[T]he term 'scheme to defraud'

connotes some degree of planning by the perpetrator, [and] it is essential that the evidence show the defendant entertained an intent to defraud." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 991 (8th Cir.1989) (alterations in original) (quoting *United States v. McNeive*, 536 F.2d 1245, 1247 (8th Cir.1976)).

It appears to the Court that Plaintiffs are attempting to convert what are garden variety breach of contract/common law tort claims into RICO claims. At the heart of their allegations is the claim that WW breached its agreement to "endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area herein defined." (Am. Compl. ¶ 97.) Plaintiffs contend that WW failed to provide Plaintiffs with the best available pricing because of its alleged unlawful business arrangement with AMI. This simple breach-of-contract allegation is not sufficient to plead criminal wire or mail fraud. A contractual undertaking for future conduct does not constitute the basis for a claim of fraud in violation of the mail and wire fraud statutes. *See Nova-Park New York, Inc. N.V. v. Banque Worms, S.A.*, No. 85 CIV. 1254 (SWK), 1987 WL 19639, at *3 (S.D.N.Y. Oct. 29, 1987) (dismissing RICO claim because statements that "are promissory in nature, or that relate to future statements" are not actionable as fraud); *see also H & Q Props., Inc. v. Doll*, No. 8:13CV38, 2014 WL 2919139, at *9 (D. Neb. June 26, 2014) *aff'd*, 793 F.3d 852 (8th Cir. 2015) ("Even if Doll's actions breached the parties' agreement, or breached a fiduciary duty owed to the LLC, such actions would be insufficient to establish RICO liability."); *Hilton Sea, Inc. v. DMR Yachts, Inc.*, 750 F. Supp. 35, 39 (D. Me. 1990) ("breaches of contracts, and even some illegal schemes perpetrated using the mails and wires are not violations of the federal wire and mail fraud statutes").

In addition to the foregoing, Plaintiffs fail to allege any fraudulent intent by the Defendants. Plaintiffs cannot plausibly contend that WW knew that it would enter the 2007 Agreement with AMI when the license agreements that contain the "endeavor provisions" were executed beforehand or that WW harbored an intention to breach the "endeavor provision" by the agreement with AMI years later. Moreover, AMI was not a party to any agreement between WW and the Plaintiffs and the Amended Complaint nowhere alleges that AMI knew or was ever informed of WW's "best-efforts" promise to the Bendfeldts.

There are many other deficiencies in the Plaintiffs' RICO claim that the Court need not discuss in detail, such as the failure to allege a continuous pattern of racketeering, the failure to plead that Defendants conducted their affairs through an Enterprise, and the failure to plead wire and mail fraud under Rule 9(b)'s heightened pleading standard. RICO claims have been described as "the litigation equivalent of a thermonuclear device" and Plaintiffs' attempt to deploy that claim here in the context of an ordinary business dispute simply fails to launch. *See Miranda*, 948 F.2d at 44. RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *H & Q Prop., Inc.*, 793 F.3d at 855-56. "Civil RICO should not be used to transform a garden variety of fraud or breach of contract case . . . into a vehicle for treble damages." *Evercrete Corp. v. H- Cap, Ltd.*, 429 F. Supp. 2d 612, 622 (S.D.N.Y. 2006). This is why courts have "rejected attempts to convert ordinary civil disputes into RICO cases." *See Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1029 (8th Cir. 2008). Accordingly, Plaintiffs' RICO claim fails.

Because the Amended Complaint fails to state a Section 1962(c) RICO claim, the conspiracy claim (Count VII) likewise fails. *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 n.2 (4th Cir. 2001).

IT IS THEREFORE ORDERED that Defendants' Motions to Dismiss Counts I, IV, VI and VII of Plaintiffs' Amended Complaint is hereby GRANTED.

Signed: September 25, 2017

Graham C. Mullen
United States District Judge