UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| MIKE BENDFELDT, WINDOW WORLD-CEDAR RAPIDS, INC., WINDOW WORLD-GRAND ISLAND, INC., WINDOW WORLD-MASON CITY, INC., WINDOW WORLD-NORTH DAKOTA, INC., WINDOW WORLD-PORTLAND, INC., WINDOW WORLD-QUAD CITIES, INC., WINDOW WORLD-SEATTLE, INC., W.O.W., INC., WINDOW WORLD-LINCOLN, INC., WINDOW WORLD-OMAHA, INC., WINDOW WORLD-SOUTH DAKOTA, INC., WINDOW WORLD – IOWA, INC., and WINDOW WORLD OF WICHITA, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | Case No. 5:17-CV-00039-GCM |
| WINDOW WORLD, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

### SECOND AMENDED COMPLAINT

COME NOW, the Plaintiffs, Mike Bendfeldt, Window World – Cedar Rapids, Inc., Window World – Grand Island, Inc., Window World – Mason City, Inc., Window World – North Dakota, Inc., Window World – Portland, Inc., Window World – Quad Cities, Inc., Window World – Seattle, Inc., W.O.W., Inc., Window World – Lincoln, Inc., Window World – Omaha, Inc., Window World- South Dakota, Inc., Window World – Iowa, Inc., and Window World of Wichita, Inc., and pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, file this Second Amended Complaint. In support of Plaintiffs' causes of action, Plaintiffs state as follows:

1. Plaintiffs Mike Bendfeldt is a citizen and resident of the State of Nebraska.

2.      Plaintiffs Window World – Cedar Rapids, Inc., Window World – Grand Island, Inc., Window World – Mason City, Inc., Window World – North Dakota, Inc., Window World – Portland, Inc., Window World – Quad Cities, Inc., Window World – Seattle, Inc., W.O.W., Inc., Window World – Lincoln, Inc., Window World – Omaha, Inc., Window World-South Dakota, Inc., Window World-Iowa, Inc., and Window World of Wichita, Inc. are Nebraska corporations with their principal office located in Omaha, Nebraska.

3.      Plaintiffs were previously licensees/franchisees of Defendant Window World, Inc. with territories in Omaha, Nebraska; Des Moines, Iowa; Denver, Colorado; Sioux Falls, South Dakota; Cedar Rapids, Iowa; Chicago, Illinois; Reno, Nevada; Davenport, Iowa; Mason City, Iowa; Portland, Oregon; Lincoln, Nebraska; Grand Island, Nebraska; Seattle, Washington; Fargo, North Dakota; and Wichita, Kansas.  All license agreements were signed by Plaintiffs individually and/or by various entities which were wholly owned and operated by them; Those entities are listed below and have assigned all right, title, and interest to the assignable claims asserted herein to Plaintiff, Mike Bendfeldt:

Window World – Cedar Rapids, Inc., Window World – Grand Island, Inc., Window World – Mason City, Inc., Window World – North Dakota, Inc., Window World – Portland, Inc., Window World – Quad Cities, Inc., Window World – Seattle, Inc., W.O.W., Inc., Window World – Lincoln, Inc., Window World – Omaha, Inc., Window World-South Dakota, Inc., Window World-Iowa, Inc., and Window World of Wichita, Inc.

4.      Defendant Window World, Inc. ("WW"), is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business in the State of North Carolina. WW is generally engaged in the business of selling a license/franchise system to

individuals and entities interested in operating a business involving the sale and installation of vinyl replacement windows, doors and siding to the general public. The license/franchise system offered by WW allows individuals and entities to use WW's trademarks, trade dress, and business methods pursuant to the terms and conditions of the license/franchise agreement between WW and its licensees/franchisees.

5. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the matter in controversy exceeds $75,000.00.

## I. Background of the Window World Franchise System

6. WW was founded in 1995 by Leon Whitworth.

7. WW operates a licensing/franchising system throughout the United States whereby it charges a fee to licensees/franchisees in exchange for the use of WW's trademarks, trade dress, and business methods. As further alleged herein, although WW has, at various times, presented its contractual arrangement as a "license", the arrangement was, in fact, a franchise.

8. WW sold its first "license" in 1997 and began operations in 1998. Since then, WW has sold "licenses" to many other business people across the country. By 2010, the number of WW "licensees" had grown to around 200 locations throughout the country.

9. Potential WW licensees were led to believe that, by executing a license agreement with WW and paying a "license" fee, they would be part of the WW system, could utilize the WW trademarks, trade dress, and business methods, and would have access to the best pricing for windows and related materials due to the volume buying power of the WW system.

10. The terms of the purported "license" agreements included various requirements related to the operation of the licensed business, including a requirement that the licensees must

purchase windows and related materials (such as caulk, weather stripping, etc.) only from suppliers approved by WW.

11. In exchange for, among other things, the "licensees" agreeing to purchase windows and related materials only from suppliers approved by WW, WW agreed to act as the licensees' agent for purposes of negotiating with vendors and suppliers. Pursuant to the terms of the agreement, WW was subject to the licensees' control and was directed to negotiate with such vendors and suppliers for the licensees to purchase supplies at prices lower than those charged to non-licensees with the applicable trade areas. Specifically, the "license" agreements represented and required that WW "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area…"

12. WW further represented and contractually agreed that it would work to further the business interests of its "licensees". Specifically, the "license" agreements stated that WW "shall use its best efforts to assist LICENSEE in any reasonable manner so as to maintain and, where appropriate, improve upon, the quality, efficiency, and profitability of the operation."

13. Although described as "license" agreements, the relationship between WW and its "licensees" is actually that of a franchise. In its agreements and course of conduct with individuals and/or entities who have licensed Window World trademarks from WW, WW has specifically structured its relationship in a manner clearly and commonly associated with franchise agreements.

14. WW has subsequently acknowledged and admitted that its relationships with business dealers to whom it licenses Window World trademarks are, and always have been, business relationships in which a franchisor licenses the right to use trademarks to franchisees, thereby creating franchise agreements under Federal law, which affords special protections to franchisees such as Plaintiffs.

15. Throughout the period that WW was selling franchises to Plaintiffs, WW knew that, in fact, it was selling franchises. For example, in the early 2000's, WW advertised that a person could "Own Your Own Window World Franchise" and that "with an investment of only $20,000, you can own your very own Window World franchise." WW also advertised that "Window World Inc. will assist in setting up your showroom, helping you pick out the best sales territories, hiring and training your employees, and show you how to run a Window World franchise successfully."

16. As its network grew, WW continued to include in its marketing materials that it was selling franchises. For example, in 2010, WW advertised that it had "Franchises for Sale" and touted that "To ensure long-term franchise profitability, Window World, Inc. offers protected location territories and in-depth start-up and on-going (monthly) training."

17. Subsequently, WW has admitted that it was operating illegally before it began making any of the disclosures required by the Franchise Disclosure Rule. For example, Mark Bumgartner made such an admission at an Advisory Council meeting in August of 2014.

18. Because it was offering and selling franchises, WW's directors and upper management knew or should have known that WW was required to make certain disclosures under Federal and state law and to comply with other Federal and state laws that govern franchisors.

19. Among these is the requirement under Federal law that franchisors make a battery of disclosures to persons considering whether to enter into a franchise agreement, which is set out at 16 C.F.R. § 436.1, *et seq.* (the "Franchise Disclosure Rule"). These franchise disclosure rules apply to franchisors, such as WW, and exist to provide transparency that protects franchisees, such as Plaintiffs, who otherwise suffer from inferior bargaining power vis-a-vis trademark owners who seek to induce others to enter into franchise relationships.

20.     The disclosures required under the Franchise Disclosure Rule include a range of financial information about the franchisor and existing franchisees, as well as information on over twenty discrete topics, which include specific disclosures regarding the franchisee's obligation to purchase supplies from specific vendors or suppliers, and disclosures regarding whether the franchisor has an ownership interest in or receives compensation from mandated vendors or suppliers.

21.     The Franchise Disclosure Rule also requires that before any franchisor unilaterally and materially alters the terms of the basic franchise agreement, it must furnish a copy of the revised agreement at least seven days before execution of the document.

22.     A number of states also have their own disclosure requirements applicable to franchisors and require franchisors to register their franchise offerings with certain state agencies before offering the franchises for sale.  Plaintiffs purchased WW franchises in four (4) of those states, including South Dakota, Washington, North Dakota, and Illinois.

23.     As further alleged herein, WW failed to meet its disclosure obligations so as to keep hidden from  its franchisees and potential franchisees, including Plaintiffs, a range of information about the true nature of the financial arrangement between WW and its franchisees, the true nature of the arrangements between WW and the suppliers required to be used by the franchisees, the true nature, scope, and extent of the revenues WW collects as franchisor from its franchisees, and the true nature of the trademarks licensed to WW's franchises.

24.     As a result of this misconduct, a number of States have entered orders enjoining WW from selling unregistered franchises. By way of example and without limitation, WW has entered into consent orders in California, Illinois, Washington, Minnesota, Maryland, and Virginia,

which in some cases impose civil penalties against WW in addition to requiring WW to offer rescission as part of the injunctive relief prescribed.

## II. Plaintiffs Acquire a Number of Window World "Licenses"

25.     As set forth in the chart below, from 2001-2009, Plaintiffs entered into a series of "License Agreements" with WW to operate WW franchises in the below-described locations:

| Date of Purchase | Location | Date Closed/Sold |
|---|---|---|
| October 16th, 2001 | Des Moines, IA | Renewed 6/20/2005 |
| October 16th, 2001 | Omaha, NE | Renewed 2/19/2007 |
| April 30th, 2004 | Denver, CO | 2004 |
| June 20th, 2005 | Sioux Falls, SD | 1/02/20139 |
| June 20th, 2005 (renewal) | Des Moines, IA | 2012 |
| June 20th,2005 | Cedar Rapids, IA | 2012 |
| February 8th, 2006 | South Cook County, IL | 2008 |
| February 8th, 2006 | North Cook County, IL | 2008 |
| August 8th, 2006 | Reno, NV | 2010 |
| February 19th, 2007 (renewal) | Omaha, NE | 1/02/2013 |
| August 27th, 2007 | Davenport, IA | 2/03/2012 |
| October 8th, 2007 | Portland, OR | 12/30/2011 |
| December 10th, 2007 | Mason City, IA | 11/09/2011 |
| April 15th, 2008 | Lincoln, NE | 1/02/2013 |
| April 15th, 2008 | Grand Island, NE | 12/02/2011 |
| September 30th, 2008 | Seattle, WA | 4/1/2011 |
| June 27th, 2008 | Fargo, ND | 2012 |
| October 19th, 2009 | Wichita, KS | 1/02/2013 |

26.     All of the License Agreements entered into by Plaintiffs were in fact franchise agreements creating a duty of disclosure under the Franchise Disclosure Rule.

27.     As further described herein, WW failed to make disclosures required by the Franchise Disclosure Rule, including important information regarding its financial dealings with a designated supplier, Associated Materials, LLC.

## III. WW Failed to Disclose its Relationship with AMI and its Receipt of "Kickbacks"

28.     Associated Materials, LLC (hereinafter referred to as "AMI") is generally engaged in the business of manufacturing and selling vinyl windows and related accessories within the wholesale market to retailers who, in turn, sell and install the products to the general public.

29.     Since at least 2000, AMI had been designated by WW as an approved non-exclusive supplier of vinyl replacement windows to WW licensees under AMI's "Alside" brand.

30.     Unbeknownst to Plaintiffs, WW's owners had significant financial entanglements with AMI. For instance, at some point prior to 2007, Leon Whitworth and his son, Todd Whitworth, acquired a stock ownership interest in AMI.

31.     Further, in September of 2007, Todd Whitworth acquired WW from Leon Whitworth and Leon Whitworth's former wife, Marie Whitworth.  In order to fund Todd Whitworth's purchase of WW, WW received a loan from AMI, which was used to fund the redemption of the WW stock owned by Leon and Marie Whitworth.

32.     At no time relevant herein, did WW disclose to Plaintiffs or other WW licensees that WW's principal(s) held stock in AMI, nor that AMI had loaned money to WW and/or WW's principal(s).

33.     WW also conspired with AMI in a scheme to designate AMI as the exclusive supplier of windows, and to inflate the price of windows so that WW could receive a "kickback" from AMI.

34.     WW initially provided lists of approved suppliers to its franchisees that included multiple approved suppliers for windows.

35.     Upon information and belief, in 2007, WW entered into discussions with AMI about the whole sale prices charged to WW franchisees.  Upon information and belief, the result of the discussions was that WW and AMI agreed that AMI would increase the price of windows sold to WW franchisees, and, in fact, AMI would charge WW franchisees a price higher than that

charged to non-WW customers. WW and AMI further agreed that WW would designate AMI as the exclusive approved supplier of windows for WW franchisees, and, in exchange for designating AMI as the exclusive supplier of windows, AMI would pay a "kickback" to WW based upon the volume of windows sold to WW franchisees.

36. Having secretly secured for itself a portion of the purchase price Plaintiffs would pay AMI for each window, WW announced that it was moving to a "sole source" supplier of windows and thereafter required that its franchisees purchase vinyl replacement windows only from AMI. After that time, Plaintiffs made their wholesale window purchases exclusively from AMI.

37. At no time did WW disclose to Plaintiffs or other franchisees that WW was receiving a "kickback" on the windows that the franchisees were purchasing from AMI, nor did WW disclose that its franchisees were paying higher prices for AMI's windows than would otherwise have been available had the franchisees not been part of the WW franchise system.

38. Upon information and belief, WW's decision to designate AMI as the exclusive supplier of windows and related accessories was not made based upon legitimate business justifications. Rather, WW designated AMI as the exclusive supplier of windows and related accessories in exchange for the undisclosed benefits that AMI agreed to give to WW, including, among other things, paying "kickbacks" to WW on windows and accessories that AMI sold to WW's franchisees and extending a loan to WW for the purpose of redeeming shares owned by Leon and Marie Whitworth.

39. In addition to failing to disclose the nature and extent of the kickbacks paid by AMI, WW also failed to disclose other payments made by WW's designated suppliers to WW, including marketing fund payments and contributions to the Window World family reunion and other Window World events and meetings.

40.     WW's withholding of information caused Plaintiffs to be ill-informed and fraudulently induced Plaintiffs to execute "Licensing Agreements" and/or renewals with WW.

41.     Similarly, WW's fraudulent failure to disclose its principal's stock ownership in AMI, loans from AMI and kickbacks to WW induced Plaintiffs to purchase windows from AMI at inflated prices.  If WW had revealed these arrangements, Plaintiffs would not have purchased windows from AMI at the inflated prices charged by AMI.

42.     From 2007 until at least the end of Plaintiffs' business relationship with WW, which occurred in 2013, WW continued to receive and accept the undisclosed "kickbacks" and other benefits from AMI in exchange for keeping AMI as the exclusive vendor of windows to WW franchisees. Throughout such time, WW withheld from Plaintiffs material information concerning the franchise relationship, intending that Plaintiffs would rely upon those material omissions by acquiring franchises from WW and continuing to operate those franchises. Plaintiffs trusted, confided, and reasonably relied, to their detriment, on WW's material omissions by paying substantial sums to acquire franchises, by paying inflated wholesale prices thereafter that resulted in funds flowing through to WW, and by expending millions of dollars advertising Window World trademarks, *all* of which benefitted WW substantially.

## IV.     WW Failed to Meet Its Obligation to Secure Superior Wholesale Pricing for Plaintiffs and other Window World Franchisees

43.     From the earliest conversations with Leon Whitworth, Todd Whitworth, and other WW representatives in or around 2001 and thereafter continuing throughout Plaintiffs' relationship with WW, WW consistently told Plaintiffs that participation in the WW network would allow them to receive the best available wholesale pricing because of WW's purchasing power and that its business model was premised on WW receiving better wholesale prices than their competitors could obtain.

44.     The "Licensing Agreements" that Plaintiffs executed specifically provided that WW "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area herein defined."   These agreements further provided that WW "shall use its best efforts to assist LICENSEE in any reasonable manner so as to maintain and, where appropriate, improve upon, the quality, efficiency, and profitability of the operation."

45.     As it turned out, WW failed to meet its commitment to secure superior wholesale pricing for its franchisees, including the Plaintiffs.   On the contrary, the amounts these franchisees pay and have paid to their vinyl replacement window supplier, AMI, *exceed* the amounts they would otherwise pay to AMI and suppliers of comparable products in the relevant markets were they not Window World franchisees.   Similarly, the amounts these franchisees pay and have paid to the suppliers of various related accessory products exceed the amounts they would otherwise pay to suppliers of comparable products in the relevant markets were they not Window World franchisees.

46.     For example, representatives of AMI have admitted that it has sold windows to non-WW retailers at prices lower than those charged to Window World franchisees.

47.     In addition, a former AMI representative has indicated that a window retailer in the Midwest, Plaintiffs' direct competitor, purchases Alside's 4000 windows with LowE/argon for $120, which is cheaper per unit price than what AMI charged the Plaintiffs for the same product.

48.     In addition, in June 2012, another Window World franchisee received an invoice from AMI that was intended for another AMI purchaser.  The invoice, dated June 11, 2012 and addressed to a window retailer with multiple store locations in the Midwest, who is not a Window World franchisee but is Plaintiffs' direct competitor, reflected a price for Alside's 0201 windows

with ETC liners and Climatech-Plus that was $29.74 cheaper per unit than the price AMI charged Window World franchisees, including Plaintiffs, for the same product. This differential increases the cost of goods sold by the Plaintiffs' franchises by more than $1 million per year.

49.     In addition to above-market prices Window World franchisees have been required to pay for vinyl replacement windows, they have also been required to pay above-market prices to AMI and other suppliers for various accessory products, including caulk, doors, siding, and garage doors.

50.     The above-market prices for these additional products further demonstrate that WW failed to meet its obligation to secure superior wholesale pricing for its franchisees.

51.     In addition to the above representations, WW further deceived WW franchisees, including Plaintiffs, by telling them that they were entitled to receive the best available pricing on windows if they hit the specified performance benchmarks. WW knew or should have known that these representations were, in fact, false.

52.     WW further deceived Plaintiffs as to the price they were paying for windows in comparison to other WW franchisees.

53.     Plaintiffs' franchises have been among the highest volume franchises in the WW network. As a result, they continually qualified for and received "B" pricing, which they reasonably understood and believed to be the best pricing available based on the foregoing representations by WW.

54.     However, unbeknownst to Plaintiffs, certain WW franchisees were receiving secret, undisclosed pricing that was even more favorable than "B" pricing.

55.     In addition to being more favorable than "B" pricing, which Plaintiffs understood to be the best available pricing based upon the representations made by WW, "C" pricing was also

arbitrary and discriminatory. Thus, despite the fact that the Plaintiffs were among the top-producing franchisees in the WW network, which WW told them entitled them to the most favorable wholesale pricing, other WW franchisees with lower levels of sales were, in fact, receiving more favorable "C" pricing.

56. WW failed to disclose the existence and nature of "C" pricing and persisted in misrepresenting the nature of the "A" and "B" pricing available to Plaintiffs and other WW franchisees.

57. WW not only misrepresented to WW franchisees, including Plaintiffs, the beneficial wholesale pricing they would receive in the WW network, they further misrepresented the levels of pricing available within the WW network and even took affirmative steps to conceal the existence of "C" pricing.

58. From at least 2007 until the end of Plaintiffs' relationship with WW in 2013, WW continued to misrepresent and mislead Plaintiffs regarding the pricing of windows.

## V.  Bismarck Trade Area

59. In addition to the Licensing Agreements executed by Plaintiffs, Plaintiffs also agreed to provide services to the Bismarck, North Dakota WW trade area after another WW licensee abandoned the trade area.

60. In the fall of 2010, WW approached Plaintiffs to request that they assist WW by servicing the Bismarck, North Dakota trade area until a permanent licensee could be identified and placed into that area.

61. Plaintiffs agreed to provide such assistance with the understanding and agreement that they would be reimbursed for costs associated with providing such service as was a common pattern and practice of WW.

62.     In fact, Plaintiffs had to hire additional office personnel in order to provide such services and provided such services until early 2013.

63.     Despite repeated assurances from WW, Plaintiffs have never received reimbursement for the costs associated with services to the Bismarck, North Dakota trade area.

## VI.     Tolling of Statute of Limitations/Continuing Wrong Doctrine

64.     Throughout the relevant period set forth herein, WW affirmatively and fraudulently concealed its wrongful conduct from Plaintiffs and all other WW franchisees.

65.     Plaintiffs did not discover and could not discover through the exercise of reasonable due diligence WW's wrongful conduct, as alleged herein, until after WW disclosed the rebates it was receiving from AMI, the nature of its relationship with suppliers, and other required disclosures, which did not occur until at least October 16th, 2012.

66.     Plaintiffs could not have discovered WW's wrongful conduct any earlier than that time because WW concealed its unlawful conduct and acts, and made affirmative misrepresentations so as to mislead Plaintiffs regarding the true nature of WW's business activities.

67.     As a result of WW's fraudulent concealment of its wrongful conduct, unclean hands and bad faith, any applicable statute of limitations was tolled and WW is equitably estopped from asserting any applicable statute of limitations.

68.     Additionally, WW is barred from relying on any statute of limitations defense against Plaintiffs in light of the continuing wrong doctrine in that WW's wrongful conduct consists of numerous and continuing unlawful acts that continued up to and including the end of Plaintiffs' business relationship with WW.

## FIRST CLAIM FOR RELIEF
### Fraudulent Misrepresentation/Fraudulent Concealment

Come now, Plaintiffs and for their First Claim for Relief against Defendant Window World, Inc. state as follows:

69.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein, paragraphs 1 to 69 of Plaintiffs' Complaint.

70.     As alleged herein, WW made misrepresentations that it knew or should have known to be false, and concealed material information that it had a duty to disclose to Plaintiffs.

71.     In particular, WW fraudulently concealed from Plaintiffs information that it had a duty to disclose, to wit: that WW or its owners have ownership interests in certain suppliers, that WW derives revenue from Plaintiffs' purchase of products or supplies, the undisclosed kickbacks or rebates WW received on Plaintiffs' purchases of products and supplies, that the prices charged to Plaintiffs for products and supplies from approved WW suppliers were inflated to provide greater revenue to WW, that the undisclosed kickbacks and rebates represent all or part of the volume discount that WW represented Plaintiffs would receive, that WW provided undisclosed "C" pricing to certain franchisees with lower levels of sales while representing to Plaintiffs that they were receiving the most favorable "B" pricing, and that WW received undisclosed compensation and consideration from its approved suppliers.

72.     WW intended to deceive Plaintiffs with respect to the pricing of products and supplies from suppliers. For example, WW repeatedly made affirmative representations that WW would secure wholesale prices from its suppliers at levels that fell below what other retail establishments could obtain in the franchise territories, that WW's buying power allowed it to secure the best prices available to franchisees, that WW had two tiers of dealer pricing ("A" and "B") for window purchases from AMI with "B" pricing being the most favorable and available to

a franchise if it achieved a certain volume of unit sales in a month, and that franchisees were entitled to receive, and, in fact, would receive the best available pricing on products and supplies if they achieved a certain volume of unit sales in a month.

73.     In fact, all of these statements were false, as WW had undertaken conduct to inflate the prices of products and supplies from suppliers.

74.     In order to induce Plaintiffs to enter the WW network, to continue to operate as WW franchisees, to pay substantial amounts of advertising WW trademarks, and to make substantial purchases from various suppliers, including AMI, WW failed to disclose, and, in fact, concealed, the foregoing information from Plaintiffs with the intention that Plaintiffs would rely upon such fraudulent statements and concealments in purchasing windows from AMI at prices that were artificially inflated due to WW's own conduct.

75.     Plaintiffs reasonably and justifiably relied upon the statements and information of WW, believe that WW was acting truthfully, honestly, and in accordance with its obligations, and otherwise in Plaintiffs' best interests.  Plaintiffs relied upon such statements and information to their detriment in purchasing windows from AMI at prices that were artificially inflated due to WW's own conduct.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant Window World, Inc., for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), an award of punitive damages, their costs herein expended, and for such other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Breach of Contract – Licensing Agreements

Come now, Plaintiffs and for their Second Claim for Relief against Defendant Window World, Inc., state as follows:

76.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein Paragraphs 1 to 69 of Plaintiffs' Complaint.

77.     Pursuant to the Licensing Agreements executed by and between Plaintiffs and Defendant, Defendant agreed that it "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area…" and that it "shall use its best efforts to assist LICENSEE in any reasonable manner so as to maintain and, where appropriate, improve upon, the quality, efficiency, and profitability of the operation."

78.     Throughout the period from 2007 until Plaintiffs' relationship with Defendant ended in 2013, Defendant breached the duty owed to Plaintiffs under the foregoing provisions of the Licensing Agreement in that Defendant did not "endeavor" to arrange for pricing of supplies such as replacement windows which were less than the prices charged to non-licensees in the trade areas operated by Plaintiffs, and it did not use its "best efforts" to assist Plaintiffs in a "reasonable" manner so as to maintain and improve the quality, efficiency, and profitability of Plaintiffs' operations. To the contrary, Defendant undertook steps to inflate the prices that Plaintiffs paid AMI for windows to increase WW's profits via the kickback scheme, thereby decreasing Plaintiffs' profitability and damaging Plaintiffs.

79.     Further, Defendant owed a duty of good faith and fair dealing under the Licensing Agreements, which required Defendant to conduct itself in a manner consistent with accomplishing the purpose of the agreement. Throughout the period from 2007 until Plaintiffs' relationship with Defendant ended in 2013, Defendant committed an ongoing breach of its duty of good faith and fair dealing by, among other things, designating and maintaining AMI as an exclusive supplier based on the improper, illegal, and undisclosed "kickbacks" and other benefits

it was receiving from AMI, rather than legitimate business justification in the furtherance of the franchise system.

80.     As set out above, by failing to secure superior wholesale pricing from suppliers, requiring that Plaintiffs purchase products and supplies at inflated prices from suppliers selected by WW, receiving undisclosed kickbacks or rebates on products and supplies purchased by franchisees from designated suppliers, providing undisclosed "C" pricing to certain franchisees with lower levels of sales, failing to assist Plaintiffs in a reasonable manner, and failing to make franchise disclosures required by applicable law, WW has breached its agreements with Plaintiffs. Defendant conspired with AMI for AMI to charge higher prices to Plaintiffs and other Window World licensees so that Defendant would receive a kickback or rebate from AMI, thereby breaching its explicit duties under the contract, as well as the duty of good faith and fair dealing.

81.     As a result of Defendant's breaches of the Licensing Agreements as aforesaid, Plaintiffs were damaged.

82.     Plaintiffs were without notice of Defendant's breach of contract until at least October 16, 2012, when Plaintiffs first discovered that Defendant was receiving "kickbacks" from AMI.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant Window World, Inc., in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), their costs herein expended, and for such other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### Breach of Contract – Bismarck Trade Area

Come now, Plaintiffs and for their Third Claim for Relief against Defendant Window World, Inc., state as follows:

Case 5:17-cv-00039-KDB-DCK    Document 86    Filed 09/07/18    Page 18 of 21

83.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein Paragraphs 1 to 68 of Plaintiffs' Complaint.

84.     Plaintiff, Mike Bendfeldt, entered into an oral agreement with Defendant whereby Plaintiffs agreed to provide services to the Bismarck, North Dakota trade area after the licensee abandoned that trade area.

85.     Under the terms of the agreement, Defendant was obligated to reimburse Plaintiffs for all costs associated with providing such services.

86.     Plaintiffs fully performed under the verbal agreement between the parties.

87.     Plaintiffs incurred costs in excess of $100,000.00 as a result of providing services pursuant to the agreement of the parties.

88.     Despite repeated demand, Defendant has failed and refused to pay Plaintiffs for the services provided by Plaintiffs to the Bismarck, North Dakota Trade Area.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), their costs herein expended and for such other relief the Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
### Negligent Misrepresentation

Come now, Plaintiffs and for their Fourth Claim for Relief against Defendant Window World, Inc., state as follows:

89.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein Paragraphs 1 to 69 of Plaintiffs' Complaint.

90.     WW owed a duty of reasonable care to Plaintiffs in providing information relating to Plaintiffs' franchise relationship with WW, including but not limited to, by virtue of the duties and obligations placed upon WW pursuant to the Franchise Disclosure Rule.

91. WW breached its duty of reasonable care to Plaintiffs by providing false information concerning Plaintiffs' franchise relationship with WW, as alleged herein.

92. Plaintiffs justifiably and actually relied to their detriment upon information prepared without reasonable care by WW.

WHEREFORE, for the foregoing reasons, Plaintiffs pray judgment against Defendant in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000.00), their costs herein expended and for such other relief the Court deems just and proper.

## **<u>Demand for Jury Trial</u>**

Plaintiffs hereby demand trial by jury on all claims so triable

DATED this 22nd of June, 2018.


/s/ Jonathan E. Fortman
Jonathan E. Fortman
Law Office of Jonathan E. Forman, LLC
250 Saint Catherine Street
Florissant, MO 63031
Telephone: (314) 522-2312
Email: jef@fortmanlaw.com

/s/ Joseph W. Moss, Jr.
Joseph W. Moss, Jr.
N.C. Bar No. 20236
Matthew Michael Holtgrewe
N.C. Bar No. 42912
Erwin, Bishop, Capitano & Moss, P.A.
4521 Sharon Road, Suite 350
Charlotte, NC 28211
Telephone: (704) 716-1204
Email: jmoss@ebcmlaw.com

*Attorneys for Plaintiffs*

## Certificate of Service

A true and accurate copy of the foregoing has been served upon all parties this 7th day of September, 2018 via the Court's ECF filing system.

_____/s/ Jonathan E. Fortman_____